**UNITED STATES of America, Appellant,**

v.

**Terry Gene CARTER, Appellee.**

No. 88–5406.

United States Court of Appeals, Eighth Circuit.

Submitted May 9, 1989.

Decided Aug. 31, 1989.

John Ulrich, Sioux Falls, S.D., for appellant.

William Fuller, Sioux Falls, S.D., for appellee.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and BEAM, Circuit Judge.

HENLEY, Senior Circuit Judge.

The United States appeals from an order of the district court[1] suppressing physical evidence and incriminating statements obtained from defendant/appellee Terry Gene Carter, who stands accused of possessing stolen mail in violation of 18 U.S.C. § 1708.

During the course of an investigation into the disappearance of various pieces of mail, postal inspectors placed several marked bills and a bearer check in the mail trays at First City Bank of Sioux Falls, South Dakota. The inspectors interviewed Russell Corner, a mailroom clerk, after discovering that he had endorsed three stolen bearer checks. Corner stated that he had received the checks from Carter, another mailroom employee of the bank, and had cashed them at Carter's request. At approximately 4:00 p.m. the same day, Carter was summoned to the office of the bank president, where he was interviewed by the inspectors for approximately an hour and a half. The bank's security manager also was present.

After the interview had proceeded for approximately fifty-five minutes, the inspectors told Carter that they were investigating the disappearance of Canadian money and asked if they could look into his wallet. Carter complied with this request, and the agents discovered $63.00 in cash and a bearer check. These were the marked items that the inspectors had placed in the mail trays. After explaining this to Carter, the agents obtained from him various incriminating statements. The inspectors then warned Carter of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Carter acknowledged that he understood those rights and signed a waiver form; he then wrote out a handwritten statement admitting his guilt. Carter was not arrested, and was allowed to go home after the interview.

Carter moved the district court to suppress his statements and the bait money as having been improperly obtained before he was given *Miranda* warnings. The district court granted the motion and suppressed the statements and the physical evidence. The court found that the interrogation occurred in a custodial setting and that *Miranda* warnings therefore should have been given. The court further found that the totality of the circumstances indicated that defendant's consent to the search of his wallet was not freely and voluntarily given inasmuch as it occurred in a coercive atmosphere, no *Miranda* warnings were given, the inspectors made a misrepresentation to Carter to induce his consent, and Carter was not informed that he was not required to produce his wallet. The United

---

1. The Honorable Fred J. Nichol, United States Senior District Judge, District of South Dakota.

States appeals from the district court's orders.

We agree with Carter's contention that *Miranda* warnings should have been given earlier in the questioning than they were. The warnings must be given before interrogation begins when a suspect is taken into custody or otherwise significantly deprived of his freedom of action. *Miranda*, 384 U.S. at 444, 467, 86 S.Ct. at 1624; *Berkemer v. McCarty*, 468 U.S. 420, 429, 104 S.Ct. 3138, 3144–45, 82 L.Ed.2d 317 (1984). In determining whether a suspect is "in custody," the "relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151. The test is not merely whether Carter believed he was free to leave; rather, we must determine whether he reasonably believed that his "freedom of action [was] curtailed to a 'degree associated with formal arrest.' " *Id.* at 440, 104 S.Ct. at 3150 (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam)); *United States v. Streifel*, 781 F.2d 953, 961 (1st Cir.1986); W.R. LaFave & J.H. Israel, 1 *Criminal Procedure* § 6.6, at 75 (Supp.1989). Our conclusion concerning custody must arise from an examination of the totality of the circumstances. *United States v. Lanier*, 838 F.2d 281, 285 (8th Cir.1988) (per curiam). We review the district court's determination on this issue under the "clearly erroneous" test, and "must affirm unless the decision of the district court is unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." *United States v. Jorgensen*, 871 F.2d 725, 728 (8th Cir.1989) (clearly erroneous standard applies to motions to suppress; custody issue reviewed along with other issues).

■ The government first argues that the district court improperly considered testimony by one of the inspectors that the investigation had focused on Carter, citing *United States v. Wallraff*, 705 F.2d 980 (8th Cir.1983). In that case we stated, "the fact that the investigation ... may be said to have focused on the defendant is insufficient to render an interrogation custodial, and 'does not weigh heavily in that analysis.' " *Id.* at 991 (citation omitted) (quoting *United States v. Jimenez*, 602 F.2d 139, 145 (7th Cir.1979)). The rationale for this statement is that the investigation's focus proceeds from the officer's subjective intentions, and thus has little bearing on the suspect's reasonable belief about his situation except to the extent that the suspect is aware of the evidence against him and is aware that the investigation has in fact focused on him. *Jimenez*, 602 F.2d at 145–46. Here, there is little if anything in the record to suggest that Carter knew of the evidence against him or that he was the focus of the investigation, although the length, place, and manner of the interrogation might have given him some indication. *See id.* at 145 (focus must be considered in light of other relevant circumstances).

■ However, we do not find, as the government contends, that the district court's decision "placed considerable weight" on the focus of the investigation. The court mentioned focus in its analysis of the custody question only once, stating, "The purpose of the interview was not simply investigatory because the detectives, through previous interviews of others, had focused their investigation toward Carter." [2] The judge made no particular finding that this had an effect on Carter's understanding of his situation. Since focus alone is insufficient to establish a custodial situation, officers could obviously focus an investigation on a suspect without taking him into custody or significantly restraining his freedom of movement. Therefore, the district court's statement may be read as merely negating a "simply investigatory" interview without concluding that that fact alone influenced or contributed to Car-

---

**2.** By "simply investigatory" the district court was apparently referring to *Miranda's* admonition that warnings are not required in the course of "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process...." 384 U.S. at 477, 86 S.Ct. at 1629.

ter's belief about his situation. It would then be incumbent on the court to proceed to a consideration of factors having more of a direct bearing on the suspect's subjective understanding, which is precisely what the district court did here. Accordingly, we do not find that the district court's mention of focus impermissibly skewed its analysis of the totality of the circumstances. We also reject the government's alternative argument that the evidence did not show that the investigation was focused on Carter, as one of the inspectors clearly testified that it had, although, as already noted, this has little if any bearing on the ultimate outcome.

The government next draws our attention to cases in which questioning at a suspect's place of employment was held to be noncustodial. *E.g., United States v. Venerable*, 807 F.2d 745, 747 (8th Cir.1986); *United States v. Rorex*, 737 F.2d 753, 756 (8th Cir.1984); *United States v. Dockery*, 736 F.2d 1232, 1234 (8th Cir.) (en banc), *cert. denied*, 469 U.S. 862, 105 S.Ct. 197, 83 L.Ed.2d 129 (1984). We have discussed the relative significance of the place in which an interrogation occurs in the following terms:

> The place where an interrogation takes place does not conclusively establish the presence or absence of custody. A deprivation of freedom may take place at one's home as well as at the police station. *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). By the same token, an interrogation at the police station may be noncustodial. *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Iverson v. North Dakota*, 480 F.2d 414, 423 n. 10 (8th Cir.[ ), *cert. denied*, 414 U.S. 1044, 94 S.Ct. 549, 38 L.Ed.2d 335 (1973) ]. Determining if there has been a deprivation of freedom entails something more than simply identifying the place of interrogation.

*United States v. Jones*, 630 F.2d 613, 615 (8th Cir.1980). Thus, in acknowledging that custodial situations occur not only in the police station, we cited with approval a case from the Fifth Circuit finding a custodial setting at the suspect's place of busi-

ness in *South Dakota v. Long*, 465 F.2d 65, 69 (8th Cir.1972), *cert. denied*, 409 U.S. 1130, 93 S.Ct. 951, 35 L.Ed.2d 263 (1973) (citing *United States v. Phelps*, 443 F.2d 246, 247 (5th Cir.1971)). *See also United States v. Beraun–Panez*, 812 F.2d 578, 582, *as amended*, 830 F.2d 127, 127–28 (9th Cir.1987) (questioning of suspect near where he was herding cattle held custodial); *United States v. Mahar*, 801 F.2d 1477, 1500 (6th Cir.1986) (suspect questioned at place of employment held to be in custody); 1 LaFave & Israel, *supra* § 6.6, at 496 ("questioning has been held to be noncustodial where it occurred at ... a place of employment ... however, it must be emphasized that the circumstances of the particular case need to be carefully assessed").

Each of the cases that the government relies upon with regard to the employment setting contains significant circumstances obviating a custodial situation, circumstances which are not present here. In *Dockery*, the suspect was advised that she did not have to answer any questions, that she was free to go, and that she was neither under arrest nor was she going to be arrested; moreover, she voluntarily initiated a second interview with the federal agents. 736 F.2d at 1233, 1234. *See Jones*, 630 F.2d at 616 ("absence of a formal arrest and the advice of freedom to decline to answer, while not conclusive, are indicative of noncustodial interrogation"). In *Venerable*, this court found not clearly erroneous the district court's conclusion that interrogation was noncustodial. 807 F.2d at 747. During "two relatively brief and noncoercive interviews ... Venerable made and received telephone calls and spoke during the interviews with other employees, and left one interview for a period of time." *Id.* In *Rorex*, a federal agent questioned the suspect in his own office, "merely asked a few non-threatening questions ... [and] made no attempt to restrict Rorex's freedom of action." 737 F.2d at 757.

This case presents a different picture, however. Carter was not questioned at his workstation, but in the bank presi-

dent's office. While the government asserts that these were familiar surroundings, the district court found otherwise, and we cannot say that finding is clearly erroneous. During questioning he was isolated from others who might lend moral support. *See United States v. Beraun-Panez,* 812 F.2d at 581, 830 F.2d at 127–28; *cf. United States v. Jorgensen,* 871 F.2d at 727, 729. At one point he offered to show the inspectors the equipment he used in his work, but they declined. While this in itself is insignificant, Carter testified that the inspectors coupled their response to his offer with the words, "no, just stay here." Moreover, Carter was seated between the two inspectors, facing the president's desk at which the bank security officer was sitting. He was not told that he was free to leave or that he did not have to answer questions. *See Lanier,* 838 F.2d at 285 (freedom to leave the scene a relevant factor in assessing totality of the circumstances); *see also United States v. Goudreau,* 854 F.2d 1097 (8th Cir.1988) (finding of noncustodial setting where suspect informed that interview was voluntary). This was the first time Carter had been detained or questioned by law enforcement officials. *Cf. United States v. Jorgensen,* 871 F.2d at 730. One of the inspectors took a "hard" approach, while the other was friendly toward Carter. *See Miranda,* 384 U.S. at 452, 455, 86 S.Ct. at 1616, 1617 ("Mutt and Jeff" technique indicative of coercive, police-dominated atmosphere). Although one of the inspectors denied this was intentional, the relevant inquiry is the effect on the suspect. *See Berkemer,* 468 U.S. at 422, 104 S.Ct. at 3141. A security officer was present in the room. *Cf. United States v. Jorgensen,* 871 F.2d at 727. Carter was questioned for nearly an hour before he confessed. Finally, he was confronted with damning evidence of guilt. *United States v. Wauneka,* 770 F.2d 1434, 1438 (9th Cir.1985). In these circumstances we discern no clear error in the district court's conclusion that Carter could have reasonably believed that the interrogation was custodial in nature. Consequently, we hold that the statements Carter made prior to receiving *Miranda* warnings must be suppressed.

This does not end our inquiry, however. The government argues that, even if the unwarned statement must be suppressed, Carter's written confession, which he executed after receiving *Miranda* warnings, should be admitted under *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). From the record on appeal we cannot ascertain that the *Elstad* argument was raised in the district court; apparently it was not, as the district court did not address the issue in its opinion. In any event, we conclude that in the circumstances of this case *Elstad* does not require reversal.

The *Elstad* opinion rejected the "fruit of the poisonous tree" and "cat out of the bag" analogies [3] with respect to *Miranda* violations, *id.* at 305–12, 105 S.Ct. at 1290–95, and held that "[a] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318, 105 S.Ct. at 1298; *see United States v. Richmann,* 860 F.2d 837, 841 (8th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2429, 104 L.Ed.2d 986 (1989). The Court distinguished *presumptive* coercion resulting from the absence of *Miranda* warnings from *actual* coercion through the use of coercive or improper methods by the police. *Id.* 470 U.S. at 307–08, 105 S.Ct. at 1292–93. Thus, statements obtained in violation of *Miranda,* although they must be suppressed as presumptively coercive, may yet be deemed voluntary in fact. *Id.* at 307, 105 S.Ct. at 1292. If the unwarned statement is voluntary, then a subsequent warned confession may be admissible if the prior statement is not the result of "deliberately coercive or improper tactics." *Id.* at 314, 105 S.Ct. at 1296. Of course, the second statement must be voluntary as well before it may be

---

**3.** *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (fruit of the poisonous tree); *United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947) (cat out of the bag).

admitted. *Id.* at 318, 105 S.Ct. at 1297–98; *United States v. Wauneka,* 770 F.2d at 1440.

■ Assuming *arguendo* that the first, unwarned, confession was voluntary, we find that the circumstances of this case do not warrant admission of the second, warned, confession. We begin by noting some important differences in the facts of this case and those in *Elstad.* In *Elstad,* an 18–year old burglary suspect was first questioned by the police in his own home.[4] 470 U.S. at 300–01, 105 S.Ct. at 1288–89. Elstad made an inculpatory statement during that initial questioning. He was then transported to the police station; approximately one hour later he was advised of his *Miranda* rights. He waived those rights and made a full statement implicating himself in the burglary. *Id.* at 301, 105 S.Ct. at 1288–89. In this case, there was no passage of time to speak of between the unwarned confession and the subsequent warnings and confession, all of which occurred as part and parcel of a continuous process. Thus, the second confession came almost directly on the heels of the first. Although *Elstad* precludes the formulation of a "rigid rule" in determining the admissibility of the second confession, *id.* at 318, 105 S.Ct. at 1298, our review of "the surrounding circumstances and the entire course of police conduct with respect to the suspect," *id.,* convinces us that the second confession cannot be allowed into evidence.

Worth noting at this juncture is the Supreme Court's concern in *Elstad* that technical violations of *Miranda* may arise from errors by the police in determining when a suspect is in custody or has had his freedom of movement significantly restrained. *Id.* at 309, 105 S.Ct. at 1293. Here, on the other hand, the custodial nature of Carter's interrogation was not unclear to the officers. As mentioned, one officer testified that the investigation had indeed focused on Carter. The inspectors themselves told Carter not to leave. They persistently interrogated him for nearly an hour, and

after inducing him to show them the contents of his wallet, confronted him with the information that it contained the bait money. By this point, at the very latest, they surely should have realized that Carter reasonably could regard himself as being in custody, and that the *Miranda* warnings were in order. Although this alone does not determine the admissibility of Carter's statement, it does demonstrate that an underlying concern of the *Elstad* opinion is largely absent here.

Moreover, the court in *Elstad* seemed chiefly concerned by the notion that a suspect is incapable of making a "subsequent voluntary and informed waiver ... for some indefinite period" once *Miranda* has been violated. *Id.* On the other hand, the Court gave no indication that it intended to give a green light to law enforcement officers to ignore the requirements of *Miranda* until *after* such time as they are able to secure a confession. While we do not intimate that the inspector's state of mind establishes the existence of custody, we agree with the district court's concern about

> get[ting] practically all that you want out of a person before you ever give them the *Miranda* rights.... I don't really think that there is [a] very good excuse for a person who concedes that he was a target—and that's what [Inspector] O'Donnell says—but they don't tell him about his rights until they have gotten everything out of him that they want.

Motion Hearing Transcript at 64.

We think *Elstad* did not go so far as to fashion a rule permitting this sort of end run around *Miranda.* In fact, the majority expressly rejected Justice Brennan's "apocalyptic" dissenting remonstration that the Court's holding dealt a "crippling blow" to *Miranda* by permitting the police to withhold warnings until the end of interrogation, and abjured what it viewed as Justice Brennan's invitation to trial courts and prosecutors to distort the reasoning and holding of the Court's opinion. 470 U.S. at

---

**4.** The state stipulated that the questioning was custodial, and accordingly the Court assumed that the interrogating officer breached the *Mi-* *randa* requirements. 470 U.S. at 315, 105 S.Ct. at 1296.

318 n. 5, 105 S.Ct. at 1298 n. 5; *see id.* at 319, 330, 105 S.Ct. at 1298, 1304 (Brennan, J., dissenting).

Moreover, the *Miranda* decision was prompted in large measure by judicial dissatisfaction with the difficulties and uncertainties inherent in case-by-case voluntariness determinations. 1 LaFave & Israel, *supra* § 6.3, at 451. The Supreme Court has recently reiterated the value of *Miranda's* bright-line qualities: "A major purpose of the Court's opinion in *Miranda* ... was to give concrete constitutional guidelines for law enforcement agencies to follow. As we have stressed on numerous occasions, one of the principal advantages" of *Miranda* is the ease and clarity of its application. *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 2097, 100 L.Ed.2d 704 (1988) (citation and internal quotations omitted). The specificity of the *Miranda* rules "benefits the accused and the State alike ..." as well as the courts. *Berkemer v. McCarty,* 468 U.S. at 430, 104 S.Ct. at 3145 (quoting *Fare v. Michael C.,* 442 U.S. 707, 718, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979)). If the police are permitted, on the other hand, to ignore *Miranda* until after they obtain a confession, the courts will once again be embroiled in the endless case-by-case voluntariness inquiries *Miranda* was designed to prevent, and the ease-of-application rationale enunciated by the Supreme Court will be largely nullified.

■ Even assuming, however, that *Elstad* permits the second confession's admission, we hold alternatively that the confession was the fruit of an unconstitutional search. *See Wong Sun v. United States,* 371 U.S. 471, 484–87, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1962); *Fahy v. Connecticut,* 375 U.S. 85, 90–91, 84 S.Ct. 229, 232–33, 11 L.Ed.2d 171 (1963); *McCloud v. Bounds,* 474 F.2d 968, 969–70 (4th Cir.1973). Although Carter does not raise this issue on appeal, the record and legal arguments concerning the voluntariness of the search of Carter's wallet are well developed, and we may affirm "on any grounds supported by the record, whether or not raised, argued, decided, or relied upon by the district court." *United States v. Wood,* 834 F.2d 1382, 1389 n. 4 (8th Cir.1987). Carter's confession came as a direct result of the search of his wallet and discovery of the bait money and bearer checks. As we affirm in the remaining portion of this opinion the district court's conclusion that Carter's consent to the search was not obtained voluntarily, we conclude that his confession must be suppressed as the fruit of the fourth amendment violation.

■ The government contends that the physical evidence, consisting of the "bait" money and bearer check discovered in Carter's wallet, should not have been suppressed. For reasons similar to those supporting its suppression of the confession, the district court found that Carter's consent to the search of his wallet was involuntar,. We look to the totality of the circumstances to determine whether consent to a search is given voluntarily. *Schneckloth v. Bustamonte,* 412 U.S. 218, 223, 93 S.Ct. 2041, 2045–46, 36 L.Ed.2d 854 (1973); *United States v. McGinnis,* 783 F.2d 755, 758 (8th Cir.1986).

The district court found that Carter's consent was involuntary as it was "given in a coercive atmosphere in which no *Miranda* warnings were given, misrepresentations were made by the postal inspectors to induce the defendant's consent, and the defendant was not informed that he was not required to consent to the search." The government contends that the district court erred in finding that the agents did not inform Carter that he need not consent to the search. The government asserts that the inspectors and the bank security officer's testimony stated that Carter was warned that he was not required to consent. We have carefully reviewed the security officer's testimony, however, and cannot find any reference in it to this issue. Carter testified that he was not so warned, and the district court was entitled to believe this testimony.

Next, the government argues that the inspectors' deceptive statement to Carter that they were searching for Canadian money is "legally inconsequential," as it overstated neither their authority nor the scope of the intended search. *See Bumper*

*v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968) (misrepresentation by police that they had a search warrant); *United States v. Dichiarinte,* 445 F.2d 126, 129 (7th Cir. 1971) (police may not use consent to search for specific items as "license to conduct a general exploratory search"). Arguing that decepton as to the object of a search is permissible, the government quotes a leading treatise writer's assertion that "at least since *Schneckloth v. Bustamonte,* it cannot be said that such deception is inherently incompatible with consent, for in *Schneckloth* the Court adopted the voluntariness test from the coerced confession cases, which has not been deemed to compel the exclusion of statements obtained by police misrepresentation of the crime under investigation." W.R. LaFave, *3 Search and Seizure: A Treatise on the Fourth Amendment* § 8.2(n) at 232 (2d ed. 1987) (footnotes omitted). However, this statement must be taken in context: LaFave's discussion centers on whether the type of deception under examination "standing alone" invalidates consent. *Id.* at 231. We agree that it does not, yet that is not to say that such deception is completely irrelevant—it still may be considered along with other factors as part of the totaity of circumstances. *See United States v. Briley,* 726 F.2d 1301, 1304 (8th Cir.1984) (misrepresentation of nature of investigation may be evidence of coercion); *see also Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 1424–25, 22 L.Ed.2d 684 (1969); *Flittie v. Solem,* 775 F.2d 933, 945 (8th Cir.1985) (misrepresentation a factor to consider in voluntariness of confession), *cert. denied,* 475 U.S. 1025, 106 S.Ct. 1223, 89 L.Ed.2d 333 (1986).

In this case, the deception was only one of the circumstances considered by the district court. In addition, Carter underwent custodial interrogation, which the Supreme Court continues to recognize as inherently coercive and compelling. *Arizona v. Roberson,* 108 S.Ct. at 2097; *Moran v. Burbine,* 475 U.S. 412, 426, 106 S.Ct. 1135, 1143–44, 89 L.Ed.2d 410 (1986). As we have noted, he was inexperienced with the criminal justice system, and had never been interrogated by law enforcement officers. *Cf. United States v. Watson,* 423 U.S. 411, 424–25, 96 S.Ct. 820, 828–29, 46 L.Ed.2d 598. He was not given *Miranda* warnings or told that he need not consent to the search. *Cf. id.* at 425, 96 S.Ct. at 828–29; *United States v. Leichtling,* 684 F.2d 553, 556 (8th Cir.1982) (failure to inform of right to withhold consent is a factor in determining voluntariness), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1184, 75 L.Ed.2d 431 (1983); *United States v. Matthews,* 603 F.2d 48, 52 (8th Cir.1979) (giving of *Miranda* warning), *cert. denied,* 444 U.S. 1019, 100 S.Ct. 674, 62 L.Ed.2d 650 (1980). The government bears the burden of establishing that Carter's consent was freely and voluntarily given. *Matthews,* 603 F.2d at 51. The district court found that the government did not meet this burden. The issue of consent to a search is a question of fact, and we will not reverse the district court's finding unless it is clearly erroneous. *United States v. McGinnis,* 783 F.2d at 758. This is a close case, but it is axiomatic that, although we might have decided differently in the first instance, we will not substitute our judgment for that of the district court absent a finding of clear error, and we do not so find.

For the foregoing reasons, we affirm the district court's order suppressing Carter's statements and the physical evidence.

BEAM, Circuit Judge, dissenting.

I respectfully dissent. In my view, the trial judge was clearly erroneous in his suppression of the evidence in this matter.

Mr. Carter was never in custody or otherwise deprived of his freedom of action in any significant way, a prerequisite to the need for the administration of *Miranda* warnings. *Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1629–30, 16 L.Ed.2d 694 (1966). Mr. Carter was called, at his office, by the bank president's secretary and was asked to come to the president's office. He was interviewed in the president's office, but he was never physically restrained. He was permitted to call his spouse when the time consumed by the discussion continued past his usual depar-

ture time and he was permitted to go to his home at the conclusion of the interview. There were no locked doors, blocked doors or communications directed to Mr. Carter that indicated that he was in custody or otherwise significantly deprived of his freedom.

Notwithstanding the noncustodial setting, Mr. Carter was ultimately given *Miranda* warnings after which warnings he prepared a statement in his own handwriting which statement, given after an oral question and answer session had ensued, inculpated him in a serious crime.

Carter's written statement, in my view, also falls well within the ruling in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). The "unwarned" remarks in *Elstad*, made in a *custodial* setting in Elstad's home, preceded an incriminating statement made after Elstad was arrested and transported to the sheriff's headquarters where he remained in a custodial status. The Supreme Court rejected the argument that the "unwarned" statement compromised the "warned" statement and the Supreme Court permitted use of the "warned" statement as evidence. Here, we have an even less problematic situation since the later statement, made subsequent to adequate warnings, was made in a noncustodial atmosphere.

Thus, I would reverse the district court and remand this matter for further proceedings at which the "warned" statement and physical evidence at issue may be used by the government in meeting its burden of proof.