UNITED STATES of America, Plaintiff,

v.

Peggy Gustafson BARNETT, Defendant.

No. A92–0073.

United States District Court,
D. Alaska.

Nov. 17, 1992.

Order from Chambers Nov. 27, 1992.

See also 814 F.Supp. 1430, 814 F.Supp. 1447, 790 F.Supp. 901.

Wevley Wm. Shea, U.S. Atty., Mark H. Bonner, Dept. of Justice, Joseph W. Bottini,

Crandon H. Randell, Asst. U.S. Attys., Anchorage, AK, for U.S.

Nancy Shaw, Federal Public Defender, Anchorage, AK, for Raymond D. Cheely, Jr.

Carmen L. Gutierrez, Anchorage, AK, for Douglas P. Gustafson.

Phillip Paul Weidner, Law Offices of Phillip Paul Weidner & Associates, Inc., Anchorage, AK, for Peggy Gustafson–Barnett.

## ORDER

SINGLETON, District Judge.

Peggy Gustafson Barnett ("Peggy") and others were jointly charged in a seven count indictment returned on August 14, 1992. The principal charge is that Peggy, her two brothers, Douglas and Craig, and a friend, R.D. Cheely, constructed a bomb and mailed it to the address of a former friend, George Kerr, who had testified against Peggy, Douglas and Cheely in a prior state murder prosecution. George was not present when the bomb arrived. The package was received at the Kerr residence on September 17, 1991 and opened by David Kerr, George's father. The package exploded, killing David and seriously injuring Michelle Kerr, David's wife.

Peggy's trial has been severed from that of her co-defendants. Her case has been reassigned to Chief Judge Manuel L. Real of the Central District of California. Trial is scheduled to begin before Chief Judge Real in Los Angeles on Tuesday, December 1, 1992. She has brought a number of motions. Her motion to suppress her confession (Docket No. 374), will be addressed in this order. Peggy also joins in two motions brought by her co-defendants seeking suppression of the results of electronic surveillance, which are addressed in a separate order at Docket No. 649. Peggy's remaining motions will be addressed in a third order at Docket No. 651.

## PEGGY'S CONFESSION

Peggy was arrested on the morning of April 1, 1992, and arraigned that afternoon. In the interval between arrest and arraignment she confessed. She seeks suppression of her confession on four related grounds (Docket No. 374): 1) that her interrogation in the absence of her retained attorney, John M. Murtagh, violated her Sixth Amendment right to counsel and that the action of the government's lawyers violated the ethical canons of the legal profession; 2) that the interrogation violated her Fifth Amendment right to the assistance of counsel; 3) that the interrogation violated her rights under *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966), *reh'g denied,* 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121; and finally, 4) that the interrogation resulted in an "involuntary" confession under the standards articulated in *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *Collazo v. Estelle,* 940 F.2d 411, 416–18 (9th Cir.1991) *(en banc), cert. denied,* —— U.S. ——, 112 S.Ct. 870, 116 L.Ed.2d 776 (1992); and *United States v. Tingle,* 658 F.2d 1332, 1336 (9th Cir.1981).

This motion was referred to Magistrate Judge Harry Branson who has filed his report and recommendation suggesting that the motion should be denied (Docket No. 556). Peggy has requested oral argument and a *de novo* evidentiary hearing. I will grant oral argument, since it will be helpful in sorting out the legal authorities.

 The request for a further evidentiary hearing presents a closer question. Peggy filed an affidavit in support of her motion to suppress in which she testified to facts which, if true, would have required suppression. The government filed opposing affidavits sharply disputing Peggy's allegations of material historical fact. I agree with Magistrate Judge Branson that an evidentiary hearing was necessary to resolve the disputed issues of material fact. *United States v. Batiste,* 868 F.2d 1089, 1091 (9th Cir.1989). It is not always necessary to hold a *de novo* hearing when a litigant objects to the factual findings made by a Magistrate Judge, *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 2412, 65 L.Ed.2d 424 (1980), *reh'g denied,* 448 U.S. 916, 101 S.Ct. 36, 65 L.Ed.2d 1179. I have obtained a transcript of the evidentiary hearing held by Magistrate Judge Branson and have reviewed it. *See United States v. Remsing,* 874 F.2d 614 (9th

Cir.1989).[1] I have also viewed the video tape of the interrogation and the transcript of that interrogation. The government asked to cross-examine Peggy and this request was denied. Peggy did not specifically ask to testify, but she now complains that she was not permitted to do so. She should be allowed to testify. It is clear that a criminal defendant does not surrender any significant legal right by testifying. *See* Fed.R.Evid. 104(d); *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Batiste,* 868 F.2d at 1092. More importantly, a suppression hearing in the view of the Ninth Circuit is evolving into the conceptual equivalent of a trial on the merits to which the rules of evidence apply, *see United States v. Brewer,* 947 F.2d 404, 410 (9th Cir.1991). Consequently, once it is determined based upon an evaluation of the affidavits submitted by the parties that material facts are in dispute, a hearing should be held to resolve the dispute and the resolution based only upon admissible evidence. The scope of the hearing will depend on the scope of the dispute. The assumption that factual disputes should be decided on evidence, not affidavits, would explain the Ninth Circuit's observation that where the defendant does not testify and the government's witnesses do testify that the defendant's affidavit should be given little weight. *See United States v. Gardner,* 611 F.2d 770, 774 n. 2 (9th Cir.1980). The only significant evidence missing is Peggy's testimony.[2] The court will schedule a brief hearing to permit Peggy to testify and then will proceed directly to oral argument. To aid the parties in preparing for oral argument, I will briefly address each issue and set out my tentative conclusions. A tentative decision is not intended to chill or discourage oral advocacy or limit counsel in the zealous representation of their parties. Tentative conclusions may have to be revised after Peggy testifies, if her testimony significantly expands on her affidavit.

### A. Sixth Amendment Right To Counsel

■ The Supreme Court has held that the Sixth Amendment right to counsel is case-specific and does not attach until commencement of the adversary proceedings. *United States v. Gouveia,* 467 U.S. 180, 187–88, 104 S.Ct. 2292, 2296–97, 81 L.Ed.2d 146 (1984). Although there is a suggestion in *United States v. Kenny,* 645 F.2d 1323, 1338 (9th Cir.1981), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 and 454 U.S. 828, 102 S.Ct. 121, 70 L.Ed.2d 104, that adversary proceedings may commence with arrest, the United States Supreme Court has held that the right only attaches at or after arraignment or indictment. *Gouveia,* 467 U.S. at 187, 104 S.Ct. at 2297. Peggy was interviewed after arrest, but prior to arraignment or indictment. Consequently, she would not appear to have had a Sixth Amendment right to counsel at the time of the interview, even though she had previously retained counsel, appeared with counsel at the grand jury and through counsel informed the United States Attorney that she would not speak to investigators unless her attorney was present.

■ Peggy also argues that the government's conduct violated Disciplinary Rule 7–

---

1. Peggy argues that 18 U.S.C. § 3501 precludes referral of the issue of the admissibility of a confession to a magistrate for pre-trial determination. Alternatively, she argues· that *de novo* review of the magistrate's decision requires a new evidentiary hearing before the court to determine issues of demeanor and credibility. Peggy has cited no cases questioning applicability of the procedures noted in *Raddatz* and *Remsing* to a hearing required by § 3501 and I see no reason for not applying these cases. I have independently reviewed the record and the transcripts. My decision to hear Peggy orally if she wishes to testify does not require that I go back and hear the other witnesses orally as well. *Raddatz* clearly holds that the court can take additional evidence without having to start from scratch. *Raddatz,* 447 U.S. at 676, 100 S.Ct. at 2412.

2. Peggy had a reasonable opportunity to cross-examine the agents regarding matters where their testimony and her affidavit diverged. Further examination of the agents would not appear to be productive, although it is possible that the government might be entitled to rebuttal after Peggy testifies. Peggy also wishes to examine the government attorneys regarding their knowledge of Murtagh and their alleged connivance in the interrogation of Peggy. The government concedes knowledge and the agent's testimony establishes that one or more attorneys observed the interrogation. Further examination on this issue would not be productive.

104 of the Code of Professional Responsibility ("Code"). The Code is not automatically controlling in federal courts, but may be made applicable by local rule. *See United States v. Ryans,* 903 F.2d 731, 734 n. 4 (10th Cir.1990), *cert. denied,* 498 U.S. 855, 111 S.Ct. 152, 112 L.Ed.2d 118. It appears undisputed that Peggy retained Murtagh prior to her arrest; that that fact was known to the United States Attorney and to the trial attorneys representing the government in this case; and that, despite knowledge that Peggy was represented, government agents, with the knowledge and approval of government attorneys, interrogated Peggy. There are two problems with applying DR 7-104 in this case: 1) It does not appear that this district has adopted the Code by local rule; and 2) although a number of cases apply this canon of the Code to government lawyers in criminal cases, the majority do so only after the Sixth Amendment right to counsel has attached. *Kenny,* 645 F.2d at 1339. A minority of jurisdictions do apply this canon of the Code to pre-indictment custodial interrogation. *See Ryans,* 903 F.2d at 736, and one case applies the canon to pre-indictment noncustodial interrogation where the target is not involved in organized crime. *See United States v. Hamad,* 858 F.2d 834 (2d Cir.1988), *cert. denied,* 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990). Where the Sixth Amendment right has not attached, this circuit finds a suppression remedy inappropriate for violations of the rule, at least where the accused is informed of her *Miranda* rights and waives them. *Coughlan v. United States,* 391 F.2d 371 (9th Cir.1968), *cert. denied,* 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968). Consequently, although I share Judge Patel's concerns that government agents may be violating the ethical canons as a matter of policy, *see United States v. Lopez,* 765 F.Supp. 1433 (N.D.Cal.1991), a violation of DR 7-104 would not appear to independently warrant suppression on this record. Of course, if the confession were obtained in violation of Peggy's *Miranda* rights, it would be suppressed on that ground.

**B.** *Fifth Amendment Right to Counsel*

■ The Fifth Amendment right to counsel does not attach until a person is: 1)

in custody, and 2) subjected to interrogation. *Rhode Island v. Innis,* 446 U.S. 291, 298–303, 100 S.Ct. 1682, 1688–91, 64 L.Ed.2d 297 (1980). This right is not offense-specific, *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); and once asserted, it prevents further police-initiated interrogation outside the presence of counsel, *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), *reh'g denied,* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984. It is clear from the record that Peggy did not request counsel during interrogation, and that she signed a form expressly waiving a right to counsel. Magistrate Judge Branson found that Peggy knowingly, intelligently and voluntarily waived her right to counsel. Absent her testimony, a final decision on that point is premature. However, assuming that she did effectively waive her *Miranda* rights during interrogation, the question arises whether *Edwards* prevents acceptance of that waiver. This determination depends upon whether Peggy's invocation of her rights at the grand jury proceeding, where she was asked to testify, and her appointing Murtagh her agent for the purposes of communicating to the United States Attorney her unwillingness to be interviewed outside of Murtagh's presence, constitutes an invocation of the right to counsel under *Edwards.* This is a close question. The government relies on the following dicta in *McNeil v. Wisconsin,* —— U.S. ——, —— n. 3, 111 S.Ct. 2204, 2211 n. 3, 115 L.Ed.2d 158 (1991):

> The dissent predicts that the result in this case will routinely be circumvented when, "[i]n future preliminary hearings, competent counsel ... make sure that they, or their clients, make a statement on the record" invoking the Miranda right to counsel. Post, [at ——, 111 S.Ct.] at 2212. We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than "custodial interrogation"—which a preliminary hearing will not always, or even usually, involve. (Citations omitted.)

This dicta has been repeated in subsequent Ninth Circuit opinions, but never to permit custodial interrogation of an accused who did

invoke her Fifth Amendment rights at a preliminary hearing or grand jury proceeding in the same case regarding the same offense. *See, e.g., United States v. Wright,* 962 F.2d 953, 954–55 (9th Cir.1992). Dicta is not, strictly speaking, binding on lower courts, and all of the policy reasons announced in *Edwards* and *Roberson* militate in favor of applying those decisions to invocations of *Miranda* at grand jury and preliminary hearings involving the same case. *See Collazo v. Estelle,* 940 F.2d 411, 421–23 (9th Cir.1991) (*en banc*), *cert. denied,* —— U.S. ——, 112 S.Ct. 870, 116 L.Ed.2d 776 (1992) (discussing the policy reasons supporting the *Edwards* rule); *United States v. Kelsey,* 951 F.2d 1196, 1198–1200 (10th Cir.1991) (same). I think that there is a good chance that the Ninth Circuit will conclude that the dicta in *McNeil* was a rumination, not a prediction, and that Peggy's act of hiring Murtagh, invoking her rights at Grand Jury and expressly informing the United States Attorney that she was not to be interrogated in Murtagh's absence triggered *Edwards* and precluded a subsequent waiver of her *Miranda* rights.[3] I believe that this is particularly the case if the circuit ultimately hears this case *en banc*. Having said this, even a rumination from seven members of the United States Supreme Court is not to be lightly disregarded by a district judge. A proper consideration of this court's role in the decision making process leads me to conclude that I should assume that the dicta in *McNeil* accurately predicts that the United States Supreme Court will hold that an accused cannot invoke his Fifth Amendment right to counsel until he is taken into custody, and prior to interrogation, warned of those rights. If this is the Supreme Court's view, then we must evalu-

ate whether Peggy in fact waived her rights free of the restraining hand of *Edwards*.

### C. The Miranda Waiver

Magistrate Judge Branson found that Peggy had waived her rights under *Miranda*, and the record seems to support his conclusion. The determination of whether there was a waiver overlaps somewhat with the separate question of whether the confessions were voluntary. *See Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987) (whether a waiver is coerced has two dimensions: 1) voluntariness, and 2) knowledge of *Miranda* rights and the probable consequences of abandoning them). I will address the voluntariness prong only in passing, reserving for the next section a more thorough analysis of Peggy's claims that her confession, and by extension waiver, of her *Miranda* rights was involuntary. Peggy does not argue that she did not understand her *Miranda* rights and the record would not permit such a finding if she did. It is clear that Peggy discussed *Miranda* with Murtagh, and shortly before she was arrested, with Sidney Billingslea, an attorney with the Federal Defender Agency, and that she passed the results of those conversations along to Craig, her brother.

■ Peggy makes essentially two arguments. First, she contends that the manner of presenting her with her *Miranda* rights prevented an effective waiver. She notes that the officers did not expect a confession given her actions before the grand jury and her retention of counsel. They therefore read her her rights but asked that she not respond immediately until they had played some tapes and discussed the evidence with her. During the interval between reading

---

**3.** This case does not involve a crime similar to the ones in *McNeil* or *Wright,* where the request for counsel involved one offense and the interrogation another. Nor is it the situation that Peggy was involved in organized crime and sought nonspecifically to avoid interrogation regarding any offense by notifying the government that she always wanted counsel present if she was to be interviewed. I recognize that the government legitimately feared an organized vendetta against men and women who were instrumental in causing the conviction of Douglas and Cheely in state court. Had government agents only interviewed Peggy about Cheely's alleged hit list or possible

future assassinations and obtained incriminating admissions, this would be a different case. Here it is clear that the agents primarily wished to interrogate Peggy about the crime for which she was ultimately indicted and for which she had clearly given notice that she was represented. The circuit could easily draft a case-specific rule applying *Edwards* to this case without undermining *McNeil* or precluding the legitimate investigation of organized crime. *See Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986) (request for counsel at arraignment triggers *Edwards* and precludes post-arraignment interrogation).

the rights and soliciting an express waiver, agent Janene Gordon made statements which qualify as an interrogation under *Rhode Island v. Innis,* 446 U.S. at 303, 100 S.Ct. at 1691. Peggy asserts that the statements recorded on pages three through five of the transcript, in which Gordon asks Peggy if she is sorry and apparently received some kind of affirmative response, are interrogatory. Peggy argues that she committed herself to being sorry, i.e. guilty, before she effectively waived her *Miranda* rights. In Peggy's view, she let the cat out of the bag, *see Oregon v. Elstad,* 470 U.S. 298, 303, 105 S.Ct. 1285, 1290, 84 L.Ed.2d 222 (1985).[4] *Elstad* provides little help to Peggy. It holds that a failure to give *Miranda* warnings at an initial custodial interrogation does not preclude the use of statements obtained at a subsequent interrogation where *Miranda* warnings are given and *Miranda* rights waived, unless the former statement was involuntary. Peggy relies upon *United States v. Carter,* 884 F.2d 368 (8th Cir.1989), for the proposition that a series of admissions elicited before any *Miranda* warnings were given tainted subsequent admissions, despite an otherwise valid *Miranda* waiver. In the view of the *Carter* court and that of Peggy, failure to suppress permits "an end run around *Miranda.*" The D.C. Circuit found *Carter* clearly distinguishable in *United States v. Gale,* 952 F.2d 1412, 1417–18 (D.C.Cir.1992), *cert. denied,* — U.S. ——, 112 S.Ct. 1302, 117 L.Ed.2d 524, in which the second statement occurred more than one hour after the first, and the first contained only a single admission and not the multiple admissions found in *Carter.* Here, the confession may have followed on the heels of the earlier admission, if there was one, but *Miranda* warnings were given, Peggy clearly understood them and expressly waived them. The Magistrate Judge's decision on this point seems clearly correct. *See Bryant v. Vose,* 785 F.2d 364, 366–68 (1st Cir.1986), *cert. denied,* 477 U.S. 907, 106

S.Ct. 3281, 91 L.Ed.2d 570, *reh'g denied,* 478 U.S. 1032, 107 S.Ct. 15, 92 L.Ed.2d 769.

Peggy next argues that her waiver was involuntary because it was the product of psychological coercion. Because this argument is identical to her argument that her confession was involuntary, I will address both aspects of the voluntariness argument in the next section.

### D. *Was Peggy's Confession Voluntary?*

■ A defendant challenging the use of his pre-trial statement against him is entitled to a hearing out of the presence of the jury, at which any disputes in the facts are resolved and a judicial determination of voluntariness is made. 18 U.S.C. § 3501; *Jackson v. Denno,* 378 U.S. 368, 391, 84 S.Ct. 1774, 1788, 12 L.Ed.2d 908 (1964). In this case, Peggy requested such a pre-trial determination; and it was initially made by Magistrate Judge Branson, who found that her confession was voluntary. The matter is now before me for *de novo* review.

■ The government must prove voluntariness by a preponderance of the evidence. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). The meaning of the term voluntary in context is not free from doubt. *See Miller v. Fenton,* 474 U.S. 104, 116 n. 4, 106 S.Ct. 445, 453 n. 4, 88 L.Ed.2d 405 (1985). This is because it encompasses at least two, and possibly three, distinct policies: 1) That the confession not be false or inaccurate; 2) that the confession not be the product of police abuse or overreaching; and, possibly, 3) that the confession be the product of a rational intellect and a free will. There is no suggestion that Peggy's confession is false or inaccurate in any significant way. Consequently, if the other tests are met, the weight of the confession is a matter to be decided by the jury.

---

**4.** The transcript reads that agent Gordon asked Peggy if she was sorry, and that after some crying, Peggy responded, "Yeah." Magistrate Judge Branson viewed the tape and concluded that Peggy did not respond, but that one of the agents had said, "Yeah." Peggy concedes that she did not say yeah. She argues that she non-verbally shook her head affirmatively and that

the transcriber translated her non-verbal communication as an affirmative response. I have viewed the tape. I find it unnecessary to resolve this dispute, because even if Peggy did shake her head in the affirmative, that single communication would not be sufficient on this record and under *Elstad* to invalidate an otherwise proper *Miranda* waiver occurring so shortly thereafter.

A recent decision of the United States Supreme Court casts doubt on the view that second and third policies describe different tests. *See Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (holding that statements volunteered by one who was mentally incompetent were not "involuntary" in the absence of police overreaching). Under this view, the accused's age, education, experience with the criminal justice system, her mental health and whether she was under the influence of drugs or alcohol would only be relevant to determine whether, under the totality of the circumstances, the interrogation constituted police misconduct and whether a resulting confession was the product of that misconduct. *Derrick v. Peterson*, 924 F.2d 813, 817–18 (9th Cir.1990), *cert. denied*, ── U.S. ──, 112 S.Ct. 161, 116 L.Ed.2d 126 (1991).

Peggy relies upon two Ninth Circuit cases for the proposition that her confession was the product of psychological coercion. *See United States v. Eccles*, 850 F.2d 1357, 1360–61 (9th Cir.1988); *United States v. Tingle*, 658 F.2d 1332, 1335–37 (9th Cir.1981). It seems to me that the Third Circuit, in *Miller v. Fenton*, 796 F.2d 598 (3d Cir.1986), properly analyzed this issue on remand after *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). The Constitution does not bar the use by investigating officers of any statement that could be construed as a threat or promise, however slight, but only those which constitute outrageous behavior under the circumstances and which in fact induce a confession. *See United States v. Guerrero*, 847 F.2d 1363, 1366 (9th Cir.1988). There must be a causal nexus between the improper police conduct and the confession, *United States v. Kelley*, 953 F.2d 562, 565 (9th Cir.1992), but it is not sufficient to show that the interrogation caused the confession, *see Guerrero*, 847 F.2d at 1365–67 (causation, including but for causation, has never been the test for voluntariness). Thus, it is not enough that the confession was caused by the interrogation; it must be caused by improper police conduct.

A review of the cases indicates that certain conduct, such as violence or the threat of violence, threats to take away a person's children unless she confesses, or statements that are materially false and upon which a person relies in confessing, will always invalidate a confession. Other threats and promises will not. Thus, promises to mention cooperation to the United States Attorney do not invalidate a subsequent confession, *Guerrero*, 847 F.2d at 1366; nor do threats to do what the agents have a legal right to do (i.e., bring the defendant to trial and seek a conviction and a realistic penalty), *see United States v. Crespo de Llano*, 838 F.2d 1006, 1015–16 (9th Cir.1987).

*Tingle* and *Eccles* are distinguishable because in those cases, the officers mislead the defendants regarding the probable consequences of refusing to be interrogated, and exaggerated the likely consequences. In *Eccles*, the court affirmed a trial court finding that Eccles felt compelled to cooperate; while in *Tingle*, the police misled the defendant into believing that she would receive a sentence of up to forty years, when in fact, her probable sentence was only a matter of months. Here, there is no indication of misrepresentation. Peggy's argument is that the agents intentionally used psychological knowledge to put her relatively at ease, led her to believe that they sympathized with her, et cetera. A review of the record establishes that Peggy realistically appreciated her situation, i.e., the probability of a life sentence if she was convicted. It also shows that Peggy was very worried about publicity, remembered the effect that past publicity from her brother's trial and conviction had had on her and her parents, and wished to avoid future publicity if she could. The record supports a finding that Peggy experienced the very human feelings of fear, shame, remorse, and a certain degree of despair, that anyone in her position would probably have experienced. If we assume that Peggy's confession is not false or inaccurate (an issue which must be determined by the jury, *see Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)), then Peggy knew that she had been instrumental in killing one person against whom she had no grievance and had seriously injured another, and that she would probably go to jail for the rest of her life. Anyone would be

prone to cry under the circumstances. Moral and psychological pressures to confess emanating from sources other than police coercion are insufficient to invalidate a confession. *Colorado v. Connelly,* 479 U.S. 157, 170–71, 107 S.Ct. 515, 523–24, 93 L.Ed.2d 473 (1986); *Greenawalt v. Ricketts,* 943 F.2d 1020, 1027 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 252, 121 L.Ed.2d 184 (1992). Peggy may have confessed as an emotional response to the fear of losing her good name in the eyes of her child, suffering separation from her family, and subjecting her family to unwanted publicity; but if so, this would not invalidate her confession. *See Bryant,* 785 F.2d at 368. The agents did not misrepresent the probable consequences of her actions or tell her that a confession would eliminate publicity. It is true, that agent Gordon did draw Peggy's attention to her children, perhaps intentionally; but Peggy was not told that cooperation would enable her to stay with her children while intransigence would not. Peggy was convinced that her life was effectively over regardless of what she told the agents. When Peggy asked if she could serve her time in Alaska so she could see her kids, no express promises were made. In summary, it does not appear that Magistrate Judge Branson was in error in concluding on this record that the government sustained its burden of proof that Peggy's confession was not the product of psychological coercion. Naturally, this conclusion might change after Peggy testifies.

IT IS THEREFORE ORDERED:

.A hearing in this matter will be held on Tuesday, November 24, 1992, at 2:00 p.m. in courtroom 3. The parties shall meet and confer and inform the court if Peggy will be testifying and if so how much time they will need. Oral argument on Peggy's motion to suppress her confession will immediately follow her testimony should she testify.

### ORDER FROM CHAMBERS

Peggy Gustafson–Barnett ("Peggy") moved to suppress certain statements she gave to postal inspectors investigating a mail bombing. Docket No. 374. The motion was originally referred to Magistrate Judge Harry Branson, who held an evidentiary hearing and recommended that the motion be denied. *See* Docket No. 556. I reviewed the transcript of the evidentiary hearing and the video tape of Peggy's statement *de novo* in conformity with *United States v. Remsing,* 874 F.2d 614 (9th Cir.1989), and concluded that oral argument was necessary and that Peggy should be permitted to testify. *See* Docket No. 650. Oral argument was heard on Tuesday, November 24, 1992. Peggy declined to testify, and the government did not press its earlier demand to cross-examine her regarding the statements in her affidavit.

At the conclusion of oral argument, I announced an oral decision denying the motion to suppress. Because the hearings were held in compliance with 18 U.S.C. § 3501, I must now set forth my findings regarding the essential facts to aid the judge to whom this case has been reassigned for trial. Fed. R.Crim.P. 12(e).

I find Magistrate Judge Branson's findings at Docket No. 556 to be accurate. In the exercise of my independent judgment, I adopt them.[1] I also incorporate by reference my discussion of the issues in my opinion at Docket No. 650, except as modified by this order.

Peggy claims that her confession was involuntary. Section 3501(b) of Title 18 of the United States Code requires that in determining whether Peggy's confession was voluntary, this court consider all of the circumstances surrounding the giving of the confession, including: (1) the time elapsing between arrest and arraignment, (2) whether Peggy knew the nature of the offense for which she was charged, (3) whether Peggy knew she was not required to make any statement and that such a statement could be used against her, (4) whether Peggy had been advised of her right to counsel, and (5) whether Peggy was without the assistance of counsel when

---

1. I have looked at the tape twice. I agree that Peggy may have given some non-verbal acquiescence regarding sorrow over her complicity before she formally waived her Miranda rights. She didn't say "yeah." What she did say was not very intelligible. I have decided the motion on the assumption that she did concede sorrow.

questioned. 18 U.S.C. § 3501(b). First, the time elapsing between Peggy's arrest, at approximately 7:00 A.M., and her arraignment at approximately 3:30 P.M. on the same day, was not inordinate. Peggy confessed within a short time after her arrest; and the bulk of the delay occurred after Peggy had confessed. The interrogation began at approximately 7:45 A.M. and ceased at about 11:30 A.M., and there was an hour break between approximately 9:20 A.M. and 10:30 A.M. I conclude that the confession was not coerced by timing considerations. Second, it is clear that Peggy knew the nature of the offense with which she was charged at the time she confessed. With respect to the third and fourth considerations, Peggy had received *Miranda* warnings at the time of the interrogation, and she had previously discussed the potential charges with two attorneys: Mr. Murtagh, her retained counsel, and Ms. Sidney Billingslea, an Assistant Federal Public Defender. After Peggy was read her rights, she told the agents to go ahead with the interrogation. I find that she understood her rights and was interested in knowing whether her father's conversation with her the previous evening was accurate; i.e., whether the agents did have incriminating statements on tape. However, with respect to the final consideration, Peggy did not have counsel present when she confessed. On balance, I find that this circumstance does not undermine the voluntary nature of the confession.

My earlier tentative decision addresses most of the points raised in Peggy's motion to suppress. I see no reason to change those conclusions. At oral argument, Peggy stressed three points. First, she argued that the postal inspectors, conniving with the United States Attorney, violated her right to counsel by interviewing her in the absence of her attorney, despite her earlier notification that she wished to have counsel present if she was to be interviewed. I think that Peggy has a point, but I do not believe that the United States Supreme Court would per-

mit suppression of a confession on that ground where, as here, the invocation of the right to counsel occurred prior to the imposition of formal charges and at a time when Peggy was not in custody. I am satisfied that Peggy received complete Miranda warnings, never requested counsel between the time of her arrest and her arraignment, and never declined to talk to the police. To the extent that Peggy's affidavit suggests the contrary, I do not find her contentions persuasive.

Peggy's second argument is that the government circumvented *Miranda* by giving her full warnings but by counseling her to refrain from deciding whether she would or would not make a statement until after she had heard the evidence they had against her, and by subsequently subjecting her to subtle interrogation before asking her to make a decision regarding waiver. In Peggy's view, her admission that she was "sorry," which she argues was a concession of her complicity in the crime, was elicited from her before she had an opportunity to collect her thoughts and decide whether to waive or not to waive. Once she had conceded her complicity, the proverbial cat was out of the bag and she felt that she had nothing left to lose. Peggy has eloquently argued this point, but I do not believe that her argument is supported by the facts.[2] After having viewed the video tape twice and having read the transcript a number of times, it seems clear to me that Peggy did not sign the waiver and make incriminating statements because she had expressed sorrow and complicity, but rather because she was convinced that the recorded conversations she had had with Douglas while he was in prison in Seward proved her guilt and doomed her to life in prison. It was the government's other evidence, and not Peggy's expression of sorrow, which lead her to believe that she had nothing left to lose and that further resistance would only lead to additional adverse publicity without hope of a fruitful outcome. I am therefore satisfied that the government has sustained

---

2. Peggy correctly notes that immediately after this episode, she asked, "Is this a statement?" In context, she seems to be asking if she is now expected to make a statement. To me, this suggests knowledge of her rights, not confusion. I

do not believe that what was said by the agents in response to Peggy's question undermined the waiver they obtained almost immediately thereafter.

its heavy burden of proving that Peggy knowingly, intelligently and voluntarily waived her *Miranda* rights.

Peggy's final argument is that the government engaged in psychological coercion by using statements and questions designed to intensify her fear of separation from her children, her desire to avoid adverse publicity and her concern about embarrassing her children and her parents. The agents knew that Peggy had earlier invoked her rights, was represented by counsel and had on earlier occasions exhibited an unwillingness to talk. They evidently did not expect to succeed in eliciting a statement from her, but they attempted to do so using what psychological knowledge they had to create an environment which would increase the likelihood of obtaining a confession. On the other hand, they did not make any promises to Peggy in exchange for confessing, other than remarking that if she plead guilty there would be less extensive publicity and less of a delay while the case was being prepared for trial. Peggy was candidly told that there would be substantial publicity at the time of her arrest because of the notoriety of the case. No misrepresentations were made. Because Peggy offered no significant resistance to the agents' questioning, they made no significant efforts to wear down her resistance. The bulk of Peggy's admissions occurred within two and one half hours of her arrest. I am satisfied that Peggy was competent, intelligent, and oriented as to time, place and circumstances at the time she confessed. Her will was not overborne. She was not the victim of psychological coercion.

IT IS THEREFORE ORDERED:

Peggy's motion to suppress her statements at Docket No. 374 is DENIED.