USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-2273

 UNITED STATES OF AMERICA,

 Appellant,

 v.

 HERMAN JOSEPH BYRAM, JR.,

 Defendant, Appellee.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. Morton A. Brody, U.S. District Judge]

 Before

 Boudin, Circuit Judge,
 
 Coffin and Cyr, Senior Circuit Judges.
 
 

 Margaret D. McGaughey, Assistant United States Attorney, with
whom Jay P. McCloskey, United States Attorney, and James L.
McCarthy, Assistant United States Attorney, were on brief for the
United States.
 Jeffrey M. Silverstein, by appointment of the court, with whom
Billings & Silverstein was on brief for appellee.

May 20, 1998

 
 
 BOUDIN, Circuit Judge. In June, 1997, Herman Byram, Jr.,
was indicted by a federal grand jury as a felon in possession of a
firearm in violation of 18 U.S.C. 922(g)(1), 924(e). In the
district court, Byram moved to suppress two statements he had made:
one while in police custody and the other comprising his later
trial testimony in a state criminal case involving a different
defendant. The district court granted the motion, and the
government brought this interlocutory appeal under 18 U.S.C. 
3231.
 The background facts, testified to at the suppression
hearing, are virtually undisputed. On the evening of June 12,
1996, and into the early morning of the next day, Byram was at the
house of his friend Donald Boyce. In the early morning of June 13,
Sean Bither, another friend of Boyce, was fatally shot during a
game of Russian Roulette. Boyce--who allegedly had helped hold the
gun to Bither's head--was later indicted and convicted of murder in
Maine state court.
 On June 13th, 1996, Detective Sergeant Dennis Appleton
was assigned to supervise the case, and he learned that someone
named "Frenchie" had been a witness to the shooting. Some time
later, Appleton discovered that "Frenchie" was Herman Byram and
that at some point during the evening, Byram had loaded Boyce's
gun. Byram was on probation at the time. After the shooting Byram
did not report to his parole officer for several months, and could
not be found by the police.
 At some point in the months following the shooting,
Appleton contacted Special Agent Kenneth MacMaster of the Maine
State Police. MacMaster had been assigned to a federal task force. 
Appleton told MacMaster that the police were looking for Byram as
a witness, and that Byram might be charged under federal law as a
felon in possession of a weapon, based on Byram's loading of the
gun on the night of Bither's murder. (Byram's explanation was that
he had reloaded the gun twice in the hope that Boyce would use the
ammunition harmlessly.)
 On February 19, 1997, after a warrant had been issued for
his arrest, Byram turned himself in to his parole officer. Byram
was immediately jailed and, the next day, was taken to Caribou
Superior Court for arraignment. Learning of Byram's arrest,
Appleton sent Detective James Madore to the courthouse to interview
Byram and serve him with a subpoena for Boyce's trial. Appleton
told Madore to ask not only about the murder, but also about
Byram's handling of the gun; it is not clear whether Appleton told
Madore about the possibility of a possession charge against Byram.
 Madore interviewed Byram in a small conference room in
the courthouse with no one else present, directing his main
questioning to Bither's death. Byram explained that he was in the
courthouse for a parole violation; Madore knew that this meant that
Byram was a felon. At first, Byram was reluctant to talk, but he
spoke readily after Madore told him that he was not "implicated in
any of this." Madore did not read Byram his Miranda rights at any
point in the interview.
 After discussing Byram's presence in the Boyce house on
the night of the murder, Madore turned to Byram's handling of the
gun. Byram discussed the details, apparently with no reluctance. 
At the end of the interview, Madore handed Byram the subpoena, and
Byram returned to the courthouse holding cell. Later that day,
Byram was arraigned, pled guilty to a violation of the terms of his
probation, and was sentenced to six months in prison. Madore
reported on his interview to Appleton and filed a written report.
 On March 4, 1997, Agent MacMaster reviewed that report,
and around that time he again discussed the matter with Appleton. 
Knowing that Byram was to testify at Boyce's murder trial, the two
men agreed to take no further action until then. Appleton also
spoke to William Stokes, who was to prosecute Boyce in state court,
about Byram's prospective testimony. They discussed whether to
advise Byram of his rights, but Appleton left the final decision up
to the prosecutor.
 On March 25, 1997, Byram, still in jail, was brought
under subpoena to testify at the Boyce trial in state court. 
Neither Stokes nor anyone else advised him of his right not to
incriminate himself or suggested that he consult an attorney. 
Byram testified in detail not only to the events surrounding the
murder, but also to his having twice loaded Boyce's gun earlier in
the day. After the testimony Appleton once again contacted
MacMaster to report that Byram had incriminated himself on the
stand.
 A couple of months later MacMaster received the
transcript of Byram's testimony, and reviewed it. On May 30, 1997,
MacMaster himself interviewed Byram at the Aroostook County Jail. 
MacMaster began the interview by reading Byram his Miranda rights,
but did not ask him any questions about his handling of the gun. 
About three weeks later, a federal grand jury indicted Byram on the
charge of being a felon in possession because of his handling of
the gun on the day of Bither's death.
 Before trial, the district court held a hearing on
Byram's motion to suppress his two statements. Byram testified and
claimed to remember that he had been read his rights by Madore at
the first interview. However, the government admitted that
Madore's evidence would be to the contrary, and the government and
the judge agreed that Madore's memory of the events was probably
more accurate than Byram's. The court also heard testimony from
Madore, Appleton and MacMaster and accepted a stipulation from the
parties concerning Stokes's actions.
 After hearing argument from the parties, the court ruled
on the motion to suppress in open court. Preliminarily, the court
found that Byram in fact had not been advised of his Miranda rights
by Madore, and also that Appleton, Madore, and MacMaster had acted
in good faith, properly giving the murder case priority over the
possession charge. The court held that, at the February 1997
interview, Byram had been in custody for Miranda purposes.
 In explaining the reasons for suppression, the judge
first noted that he found the voluntariness of both Byram's
statement to Madore and Byram's open court testimony "suspect," and
went on to say, "I'm satisfied that the defendant was not advised
of his rights at any time . . . prior to those statements and that
he should have been. . . . I'm not going to suggest at which stage
or by whom." The court then concluded that Byram had been deprived
of his due process rights, and granted the motion to suppress both
statements. This appeal followed.
 On appeal, the government has decided not to challenge
the district court's exclusion of Byram's initial statement to
Madore in the courthouse on February 20, 1997; but it vigorously
objects to the exclusion of Byram's March 25, 1997, trial
testimony. We consider in turn three possible grounds for
exclusion of the trial testimony: that it was the "fruit" of an
involuntary confession, that it was the result of outrageous police
conduct that shocks the conscience, and that it was the fruit of
the Miranda violation.
 Voluntariness. The district court expressed doubt
whether Byram's statements to Madore and his testimony in open
court were "voluntary" but did not expressly decide the issue. If
we shared serious doubts about the voluntariness of the statements,
we would probably remand for further findings because
involuntariness is the best-settled and narrowest ground on which
this case could be decided; the Miranda fruits issue, as we will
see, is unusually difficult. However, the voluntariness standard
has been refined by the Supreme Court in a manner that makes a
voluntariness claim too doubtful to warrant a remand, and we think
it useful to explain why.
 Historically, the requirement that admissible confessions
be "voluntary" reflected a variety of values; these included
deterring coercion, assuring reliability of confessions, and
protecting the suspect's free choice whether to confess. Thus, at
common law, confessions produced by promises not to prosecute or
offers of leniency were often excluded as involuntary. See 1 W.
LaFave & J. Israel, Criminal Procedure 6.2, at 440 (1985). And
early Supreme Court cases looked in the same direction. E.g.,
Lisenba v. California, 314 U.S. 219, 234 (1941).
 However, in recent years, the Supreme Court has confined
the voluntariness concept by holding that only confessions procured
by coercive official tactics should be excluded as involuntary. 
Colorado v. Connelly, 479 U.S. 157, 167 (1986). See United Statesv. Santos, 131 F.3d 16, 19 (1st Cir. 1997); LaFave & Israel, supra,
 6.2 at 87 (Supp. 1990). "Free choice" is no longer a touchstone;
indeed, the Supreme Court has ruled in Connelly that a volunteered
confession was admissible even if the product of a psychosis that
undermined the suspect's ability to make a free and rational
choice.
 Judging whether improper police coercion occurred depends
on the circumstances, but despite the district court's reservations
it would be difficult to describe Byram's statements as coerced
under Connelly. At no point did the police threaten violence or
serious retaliation if Byram refused to speak; the questioning was
not prolonged; and the atmosphere at the February 1997 courthouse
interview appears to have been benign. Indeed, Byram does not
seriously argue that Madore coerced him during the interview. 
There is even less reason to regard Byram's later trial testimony
as the result of coercion.
 Byram's main claim throughout has been that he was
tricked by Madore's assurance that he was not implicated in
Bither's death, literally true so far as the murder charge was
concerned but a suggestio falsi as pertains to a possible
possession charge. Certainly some types of police trickery can
entail coercion: consider a confession obtained because the police
falsely threatened to take a suspect's child away from her if she
did not cooperate. See Lynumn v. Illinois, 372 U.S. 528, 534
(1963). See also Spano v. New York, 360 U.S. 315, 323 (1959).
 But trickery is not automatically coercion. Indeed, the
police commonly engage in such ruses as suggesting to a suspect
that a confederate has just confessed or that police have or will
secure physical evidence against the suspect. While the line
between ruse and coercion is sometimes blurred, confessions
procured by deceits have been held voluntary in a number of
situations. Frazier v. Cupp, 394 U.S. 731, 739 (1969) (confession
obtained by false statement that co-conspirator had confessed); see
also Holland v. McGinnis, 963 F.2d 1044, 1051 (7th Cir. 1992),
cert. denied, 506 U.S. 1082 (1993). But see United States v.
Rogers, 906 F.2d 189, 192 (5th Cir. 1990).
 Given the narrowed definition of coercion in Connelly, it
would be very hard to treat as coercion a false assurance to a
suspect that he was not in danger of prosecution. (Of course, a
false assurance might undercut the gist of a warning, raising
questions whether Miranda had been satisfied; but that is a
different problem that we need not address since no Mirandawarnings at all were given here.) We conclude that under ConnellyByram's interview statement, like his trial testimony, would not be
"involuntary" even if he were deceived, a legal conclusion that
makes any remand pointless.
 Outrageous Misconduct. Byram argues that regardless of
coercion, the methods used to obtain his statements were so
shocking to the conscience that they violated his rights to
"substantive due process." The classic case is Rochin v.
California, 342 U.S. 165, 172 (1952), where retrieving evidence by
pumping the suspect's stomach was regarded as so at odds with
civilized values that the evidence had to be excluded. Since
Rochin, courts have from time to time invoked this standard to
exclude evidence, but normally with some caution and only in the
most extreme of cases. See, e.g., United States v. Fernandez-Caro,
677 F. Supp. 893, 894-95 (S.D. Tex. 1987); cf. United States v.
Santana, 6 F.3d 1, 4 (1st Cir. 1993) ("[T]he outrageous misconduct
defense is almost never successful.").
 Given the district court's finding of good faith, the
police conduct cannot be described as shocking to the conscience or
beyond the bounds of civilized behavior. The police were
investigating a homicide and thought, correctly, that Byram was a
helpful witness, not implicated in the murder. As to the
possession charge, Appleton did not tell Madore to omit the Mirandawarning during the interview; and Madore, although he should have
known that Byram was a suspect, said that he was focusing on the
murder (and the district court apparently believed him).
 Further, the Supreme Court's tolerance of police guile in
Frazier makes clear that the police can often mislead suspects, at
least where coercion is not involved; thus, it is impossible to
treat all such false statements as improper, let alone outrageous
or uncivilized. Police investigation can be a rough business, and
untruths may sometimes be necessary to save a kidnap victim,
retrieve a missing firearm, or for other reasons quite apart from
the desire to solve a specific crime already committed. See New
York v. Quarles, 467 U.S. 649, 656-57 (1984). In this case, "facts
more egregious than those presented here" would be required to
"rise to a level of a due process violation." Moran v. Burbine,
475 U.S. 412, 432 (1986). 
 Miranda. This brings us to the Miranda doctrine which,
with certain exceptions, renders inadmissible statements obtained
through custodial interrogation unless the police officer informed
the suspect of his right to remain silent and to consult an
attorney. Miranda v. Arizona, 384 U.S. 436, 478-79 (1966). 
Despite the government's reserved objection, we think that during
the interview with Madore, Byram was unquestionably being subject
to deliberate custodial interrogation. Garcia v. Singletary, 13
F.3d 1487 (11th Cir. 1994), involving an on-the-spot inquiry by a
guard who saw a prisoner burning his mattress, is miles away from
the present case.
 But Miranda does not extend to Byram's trial testimony. 
He was brought from jail under subpoena, but the testimony was
given in open court and involved none of the dangers of jail-cell
interrogation that prompted Miranda. The Supreme Court has held
that a grand jury witness is not entitled to a Miranda warning
before testifying, United States v. Mandujano, 425 U.S. 564, 579
(1976) (plurality opinion), and it would hardly hold otherwise in
the case of trial testimony, see id. at 582. Judges often warn
trial witnesses, or even call in counsel, where a witness appears
to be on the verge of incriminating himself, but this admirable
practice is not commanded by the Constitution.
 The question, then, is whether the earlier statements
unlawfully obtained under Miranda tainted the court testimony. 
Where a confession is coerced, evidence derived directly from the
confession can also be excluded as involuntary under a doctrine
similar to the "fruit of the poisonous tree" doctrine. However, in
Oregon v. Elstad, 470 U.S. 298, 309-10 (1985), the Supreme Court
flatly forbade automatic application of the fruits doctrine for
Miranda violations. Compare 1 LaFave & Israel, supra, 9.5, at
762 (discussing pre-Elstad decisions in lower courts).
 Some circuits have taken the view that Elstad is the end
of any use of the fruits doctrine based on a Miranda violation. 
Yet Elstad itself involved what most people would regard as a
highly "technical" violation of Miranda--a volunteered statement by
the suspect in his own home before being taken to the police
station. More importantly, the later statements made at the police
station, held admissible in Elstad, were made after the
conventional Miranda warnings were given. Thus, the Eighth Circuit
suggested that Elstad may be confined to cases where the Mirandaviolation is merely technical. United States v. Carter, 884 F.2d
368, 373 (8th Cir. 1989).
 Our own view, highly tentative in the absence of more
guidance from the Supreme Court, is that Elstad would be hard to
confine to technical violations; its language emphasizing the
voluntariness test as the prime safeguard is too powerful for that. 
But by the same token we think that Elstad does not wholly bar the
door to excluding evidence derived from a Miranda violation--at
least where the Miranda violation is not merely technical, where
there is a substantial nexus between the violation and the second
statement, and where the second statement is not itself preceded by
an adequate Miranda warning.
 This is very much a description of the present case. 
Here, in contrast to Elstad, the original Miranda violation was not
technical. We accept that Madore questioned Byram in good faith
and did not consciously aim at implicating him in a crime, yet by
any objective test, the threat that Byram would be implicated in a
possession charge was clear. See Rhode Island v. Innis, 446 U.S.
291, 301-02 (1980). Madore further assured Byram that he was not
implicated in any of "this." Thus, Byram returned to jail likely
believing that his statements did not put him in danger.
 Byram remained in jail without ready access to legal
counsel until called to testify under the subpoena that Madore had
served on him. Then, with no new warning that he could remain
silent or consult with a lawyer (again, in contrast to Elstad),
Byram was deliberately asked questions by the prosecutor to elicit
the same self-incriminating statements about possession that Madore
had extracted. Byram's trial testimony was thus very much
facilitated by the original Miranda violation, which was neither
technical nor mitigated by an intervening warning.
 Two members of the panel think that under all the
circumstances, Byram's state trial testimony should be suppressed
in the federal case as the product of a Miranda violation. The
third member of the panel has doubts whether this is consistent
with the literal language of Elstad but agrees that Elstad is
distinguishable on its facts and that the Supreme Court was not
laying down an iron rule debarring a "fruits" argument in all
Miranda cases. All members of the panel agree that the events in
this case are unusual and that Elstad discourages any promiscuous
use of the fruits doctrine in ordinary Miranda cases.
 Accordingly, we conclude that both sets of statements--
Byram's admissions to Madore and Byram's trial testimony in the
Boyce case--should be suppressed, although our reasoning is
somewhat different from that of the district court. The
suppression order is therefore affirmed.