Filed 8/18/23  P. v. Kamson CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>ADETOKUNBO OLATUNDE KAMSON,<br><br>　　　Defendant and Appellant. | B319463<br><br>(Los Angeles County<br>Super. Ct. No. YA100507) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Scott T. Millington, Judge.  Affirmed.

Law Offices of Charles O. Agege and Charles O. Agege for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Adetokunbo Olatunde Kamson (defendant) is a former pediatrician who stands convicted of two felonies and a misdemeanor after he sexually touched two young women—one a then-current patient and one a former patient—during visits to a medical clinic.  He raises nearly a dozen challenges to his convictions, some of which rest on fundamental misunderstandings of the law.  All of his arguments are meritless.  We accordingly affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Facts

In 2019, defendant was a pediatrician at a community medical clinic in Inglewood, California, which provided services to both children and adults.

### A.    *Molestation of Jennifer M.*

On April 24, 2019, Jennifer M. went to the clinic to talk to defendant to see if he would consider hiring her as an extern at the clinic as part of her medical assistant schooling, as she and defendant had previously discussed.  Jennifer was still a regular patient of defendant's, despite having recently turned 18.  Although Jennifer told the front desk her non-medical reason for visiting, the medical staff still took her vitals and had her wait for defendant in an exam room.

2

When defendant came into the exam room, Jennifer told him that she had finished her classes and was ready to start an externship. After discussing the details of the externship, defendant asked Jennifer if she was feeling any pain or discomfort, or experiencing headaches. He checked her eyes, ears and mouth. He asked her to lay back on the exam table, unbuttoned her jeans, and proceeded to put pressure on her stomach and sides on the pretense of "checking [her] liver." Defendant then asked if Jennifer had ever performed a breast exam on herself; when she said she had not, he said, "Let me show you," asked her to unclasp her bra, grabbed both of her bare breasts with both of his hands, and then squeezed her breasts and her nipples for approximately one minute. He made no sounds while doing so. Defendant then asked Jennifer to remove her jeans and pull down her underwear, and asked whether she was menstruating or was sexually active. When she laid back down with her legs dangling off the edge of the exam table, defendant put on gloves and inserted his fingers into her vagina, touching the sides of her vagina and then moving "in and out" for approximately one minute; when his fingers started to "hurt" Jennifer, she asked him to stop, but he persisted for another 10 seconds. Jennifer thought the entire examination was "odd," but she was confused because she trusted defendant as her doctor.

### B.     *Molestation of Liset R.*

Less than two months later, on June 13, 2019, Liset R. went to the clinic because she was meeting with a doctor to get a referral to an OB/GYN specialist and because her five-year-old daughter needed a check-up. Defendant had been Liset's doctor until she turned 18, and had become Liset's daughter's doctor. After clinic staff escorted Liset and her daughter to an exam

3

room, and after defendant spent 15 minutes examining the daughter, defendant then asked Liset if she was pregnant; when she said, "yes," defendant asked if the baby's father was the same as her five year old's father.

Defendant asked if he could see Liset's stomach. When she said, "yes," he touched her stomach through the one-piece, strapless romper she was wearing. He then asked, "May I?"; when Liset nodded, defendant pulled the top portion of the romper down to Liset's waist, thereby exposing her breasts (as she was not wearing a bra). Liset thought that defendant "was trying to . . . examine" her. Defendant then started to touch her breasts with his bare hands, pushing them up and then down as well as pinching her nipples between his thumb and index finger. While doing so, he commented that her nipples were "pointy." Defendant also smiled at Liset and made "sexual sound[ing]" "moaning noises." Seeing this, Liset's daughter exclaimed, "Ew, Mommy, why is he touching your chi-chis? That's nasty." Defendant did not stop, but told the daughter, "It's okay. I know your mommy. I take good care of your mommy." After 10 to 15 seconds of groping Liset's breasts, defendant asked, "May I?" a second time, and when she nodded, defendant slid one of his hands inside her underwear; he was still not wearing gloves. He touched her labia by moving his fingers in a circular motion, at one point asking if she shaved her pubic hair. Defendant then tried to penetrate her vagina with his finger, but she tightened up her legs to prevent him from doing so. After 10 to 15 seconds, defendant stopped and then turned to wash his hands. Liset was "confused" about what had happened but "didn't know what to do."

## II.     Procedural Background

On February 4, 2020, the People charged defendant with (1) two felony counts of sexual battery by fraud (Pen. Code, § 243.4, subd. (c)),[1] one for each victim; and (2) two felony counts of sexual exploitation of a patient (Bus. & Prof. Code, § 729, subd. (a)), one for each victim.  The People subsequently filed an amended information that alleged four factors "in aggravation" that would support a high-term sentence.

The matter proceeded to a two-day jury trial in early March 2022.  After the court granted an acquittal on the sexual exploitation count against Liset (because she was no longer defendant's patient) and reduced the sexual exploitation count against Jennifer to a misdemeanor, the jury returned guilty verdicts for the remaining counts.  Defendant waived his right to a jury trial on the aggravating factors, and the trial court found them to be true.

The trial court imposed a sentence of three years in prison, comprised of a low-end sentence of two years on the sexual battery by fraud count against Liset, followed by a consecutive sentence of one year (calculated as one-third of the midterm, three-year sentence) on the sexual battery by fraud count against Jennifer.  The court stayed the misdemeanor count under section 654.

Defendant filed this timely appeal.

### DISCUSSION

Defendant raises nearly a dozen challenges (many with sub-challenges) to his convictions.  Once stripped of hyperbole and an overuse of adverbs, his arguments fall into five categories.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

5

# I.    Sufficiency of the Evidence

Defendant argues that the People did not present sufficient evidence at trial to support the jury's verdicts, although his challenge to the misdemeanor count is largely duplicative of the felony counts insofar as it attacks only the specific intent element common to all of those counts.

To prove sexual battery by fraud, the People must prove that (1) the defendant touched an intimate part of the victim's body (which includes the groin, any "sexual organ," or a woman's "breast"); (2) the touching was done for the specific "purpose of sexual arousal, sexual gratification, or sexual abuse"; and (3) the victim was not "[]conscious of the [sexual] nature of the act" because of the fraudulent representation "that the touching served a professional"—here, a medical—"purpose" when, in fact, it did not.  (§ 243.4, subds. (c), (f), (g)(1); CALCRIM No. 937; *People v. Pham* (2009) 180 Cal.App.4th 919, 928 (*Pham*) ["The unconsciousness requirement . . . simply requires proof the defendant tricked the victim into submitting to the touching on the pretext it served a professional purpose"].)

Our review of the sufficiency of the evidence is limited.  We only ask whether the record as a whole ""discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a *reasonable trier of fact* could find the defendant guilty beyond a reasonable doubt.""  (*People v. Ghobrial* (2018) 5 Cal.5th 250, 277.)  In undertaking this inquiry, we view the evidence in the light most favorable to the jury's verdict, which includes "resolv[ing] conflicting inferences" and credibility findings in favor of the verdict.  (*People v. Casares* (2016) 62 Cal.4th 808, 823, overruled on other grounds in *People*

*v. Dalton* (2019) 7 Cal.5th 166; see *People v. Reed* (2018) 4 Cal.5th 989, 1006.)

### A. *As to Jennifer M.*

Sufficient evidence supports the jury's verdict that defendant committed sexual battery by fraud on Jennifer. Jennifer testified that defendant touched her breasts as well as her sexual organ. Circumstantial evidence also establishes that defendant touched Jennifer for the specific purpose of sexual arousal: Jennifer went to the clinic for a non-medical reason; defendant, who is a pediatrician, had no medical reason to touch Jennifer's breasts and vagina; and the manner in which he touched her is consistent with how consenting adults touch one another for sexual purposes. (*People v. Westerfield* (2019) 6 Cal.5th 632, 713 [sufficient evidence standard is "'the same in cases in which the prosecution relie[d] mainly on circumstantial evidence'"].) And Jennifer was not conscious of the sexual nature of defendant's touching because he implied—by virtue of the fact that he was Jennifer's doctor touching her in an examination room at the clinic while sprinkling in medical-sounding questions about breast exams, menstruation, and whether Jennifer was sexually active—that his touching had a medical purpose when it did not.

Defendant resists this conclusion with two arguments. First, he argues that he did not moan as he groped her and that Jennifer did not testify that his penis was erect while he was touching Jennifer's breasts and vagina. But neither audible nor visual evidence of the defendant's arousal is a required element of this crime. (Accord, *Pham*, *supra*, 180 Cal.App.4th at p. 927 [upholding conviction when defendant exhibited a "professional demeanor" while committing the battery and without any

7

evidence of an erection].)  Second, he argues that because he put on gloves before he penetrated Jennifer's vagina with his fingers, he is entitled to an acquittal, ignoring that the statute's definition of "'touch[]'" includes touch "through the [perpetrator's] clothing."  (§ 243.4, subd. (f).)  By defendant's logic, a doctor would be entitled to an acquittal of this crime if he wore a condom when penetrating a patient with his penis.  This is an inane argument, and we reject it.[2]

Sufficient evidence also supports the jury's verdict that defendant committed sexual exploitation of Jennifer, which occurs when a physician has "sexual contact with a patient" "outside the scope of medical examination and treatment" "for the purpose of sexual arousal, gratification, or abuse."  (Bus. & Prof. Code, § 729, subds. (a), (b), (c)(3).)   Jennifer was defendant's current patient, breast and pelvic exams are typically outside of the scope of a pediatrician's medical examination and treatment, the touching departed from medical practice standards, and the jury could reasonably infer that the touching occurred for the purpose of defendant's sexual gratification.

### B.     *As to Liset R.*

Sufficient evidence supports the jury's verdict that defendant committed sexual battery by fraud on Liset.  Liset testified that defendant touched her breasts as well as her groin.  Liset's testimony that defendant was moaning in a sexual manner constitutes particularly compelling evidence that he touched her with the specific purpose of sexual arousal, especially

---

[2]     Because there is sufficient evidence that defendant acted with the purpose of arousing *himself*, we need not confront whether section 243.4, subdivision (c), also criminalizes touching intended to arouse or abuse *the victim*.

when coupled with the evidence that Liset was no longer his patient and she was in the exam room for defendant to examine *her daughter*. And Liset was not conscious of the sexual nature of defendant's touching because he implied—by virtue of the fact that he was asking her medical questions about her pregnancy in an examination room at the clinic—that his touching had a medical purpose when it did not.

Defendant resists this conclusion with two arguments.

First, he argues that the parties stipulated that his DNA was recovered from Liset's stomach hours after he examined her, but that none of his DNA was recovered from her breasts or vaginal area. From this, he argues that the there was no evidence that he touched Liset's breasts or vaginal area. But there was: Liset *testified* that he touched her breasts and vaginal area. Because a single witness's testimony can establish a fact unless it is "'physically impossible or inherently improbable'" (*People v. Brown* (2014) 59 Cal.4th 86, 106), Liset's testimony was sufficient. Defendant urges that we must disregard Liset's testimony because it is "inherently improbable" that a person can touch something and *not* leave DNA, and because prosecutors should not be able to do DNA testing (or, by extension, fingerprint or other forensic testing) and then argue that a negative result means anything other than an acquittal for the defendant. Defendant cites no law to support his argument, and we reject it as inconsistent with common practice and common sense.

Second, defendant argues that there is insufficient evidence to show that Liset was unconscious of the true nature of the touching because (1) he repeatedly asked her, "May I?" before touching her, he asked if he could "touch" her stomach rather

than "examine" it, and Liset did not come into the office with the intent of having him examine her, which—in defendant's view—suggests a non-medical purpose for his touching (and hence no false representation of a medical purpose); and (2) Liset tried to clamp her legs together more tightly when defendant sought to penetrate her vagina after first touching her breasts and labia. But the fact that defendant asked, "May I?" before taking off the upper half of Liset's romper or putting his hands down her underwear (or the fact that he said "touch" rather than "examine") does not negate the fact that he is a doctor, and *her* former doctor, touching her after asking about her pregnancy while in the exam room of a medical clinic. The fact that defendant did not explicitly say, "I am doing this for a medical reason," is of no moment because juries may infer a defendant's representation of a medical purpose from the totality of the surrounding circumstances. (*People v. Icke* (2017) 9 Cal.App.5th 138, 145, 147, 149 (*Icke*); *Pham, supra*, 180 Cal.App.4th at p. 926; *M.N. v. Morgan Hill Unified School Dist.* (2018) 20 Cal.App.5th 607, 622 [as to specific intent element of sexual battery claims, ""'[i]ntent is rarely susceptible of direct proof'""].) That Liset did not walk into the examination room with the intent to get an exam herself does not somehow preclude defendant from *subsequently* and falsely representing that he wanted to examine her for medical reasons: He asked her about her pregnancy and touched her stomach, and these acts changed the nature of her visit. And Liset's act of preventing a further and more intrusive battery by clamping her legs shut does not mean she was unconscious of defendant's non-medical purpose; a jury could just as easily infer that she was not comfortable with a medical examination going so far. Even if it did evince some awareness,

10

"the victim's unconsciousness of the sexual nature of the act" need not be "absolute"; it is enough that the victim is "confus[ed]" (*Icke*, at p. 149; *People v. Sommer* (2021) 61 Cal.App.5th 696, 702), and that is precisely what Liset testified to being. Further, even if Liset were fully aware of the sexual nature of defendant's touching at the time she clamped shut her legs, her awareness *by that time* did not somehow erase the battery that had occurred prior to that time when defendant aggressively groped her breasts and touched her labia.

## II. Admissibility of Defendant's Pre-Arrest Statement To Impeach

Defendant contends that the trial court erred in ruling that the statement he made after being pulled over and questioned by police on April 24, 2019 was still admissible to impeach him.

### A. *Pertinent facts*

While police were interviewing Jennifer in the late afternoon of April 24, 2019, she identified defendant driving away from the clinic in his SUV. The officers interviewing her got into their patrol car, followed defendant for half a block, and effected a traffic stop using their lights and sirens even though they had not observed any Vehicle Code violation. The officers asked defendant to get out of his car, patted him down for weapons, told him that they had a complaint from a patient and asked if he would be willing to answer questions; they did not inform him he was free to leave. Without giving him *Miranda* warnings, the officers proceeded to talk to defendant about Jennifer's examination while they stood on the public sidewalk for approximately 15 to 20 minutes, just before sunset. During this conversation, defendant stated that he "checked [Jennifer] from top to bottom," including "check[ing] her skin for rashes,"

11

"conduct[ing] a breast exam," "check[ing] her spleen," and "conduct[ing] a pelvic exam." Although the officers were in uniform and armed, they did not touch their guns, place defendant in handcuffs, or otherwise use any force during this conversation. After checking with his supervisor, one of the officers then arrested defendant.

Prior to trial, defendant moved to suppress his statement under *Miranda v. Arizona* (1966) 384 U.S. 436 and under due process. After a suppression hearing at which one of the officers testified, the court granted the motion, ruling that defendant had been subjected to "custodial interrogation" without first being advised of his *Miranda* rights. The court ruled that the People could not use defendant's statement in its case-in-chief, but could use it to impeach defendant if he took the stand and testified inconsistently. The court rejected defendant's further argument that the statement was involuntary (and hence also not admissible to impeach), finding that the "totality of the circumstances" showed defendant's statement to be "voluntary."

**B.** *Analysis*

Here, neither party is attacking the trial court's ruling that the police obtained defendant's statement on April 24, 2019 in violation of *Miranda*. When a statement is obtained in violation of *Miranda*, the People may not use that statement in their case-in-chief but may still use it to impeach the defendant should he testify inconsistently during the trial. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1075 (*Nguyen*); *People v. Peevy* (1998) 17 Cal.4th 1184, 1188; *Harris v. New York* (1971) 401 U.S. 222, 225 (*Harris*).) Requiring non-*Mirandized* statements to be excluded in the People's case-in-chief but not for impeachment balances the need to incentivize adherence to *Miranda* against the danger

12

that "'police misconduct [will] become a shield for perjury.'" (*Nguyen*, at p. 1076.)  Of course, a non-*Mirandized* statement may not be used to impeach if that statement is "involuntary" within the meaning of the due process clause because involuntary statements are inadmissible for *all* purposes.  (*People v. Case* (2018) 5 Cal.5th 1, 24; *People v. Neal* (2003) 31 Cal.4th 63, 85.)  A statement is involuntary under the due process clause "if official coercion caused the defendant's will to be overborn, such that the resulting statement is not the product of "'"'a rational intellect and free will.'"'"'"  (*People v. Orozco* (2019) 32 Cal.App.5th 802, 819; *People v. McWhorter* (2009) 47 Cal.4th 318, 346-347 (*McWhorter*).)  We independently examine whether the totality of the circumstances shows the statement to be involuntary. (*People v. Linton* (2013) 56 Cal.4th 1146, 1176; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1086.)

We independently agree with the trial court that the circumstances of the roadside interrogation did not overbear defendant's will and render his statement "involuntary."[3]  He was questioned on a public street by two or three officers for 15 to 20 minutes; they made no promises, they made no threats, they did not lie to him or otherwise engage in any subterfuge.  (See *McWhorter*, *supra*, 47 Cal.4th at p. 347 [a statement "may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper

_____

[3]     We reject the People's argument that defendant waived this issue by not taking the stand to testify.  There are several cases directly on point rejecting this exact argument (*People v. Brown* (1996) 42 Cal.App.4th 461, 469-471 [collecting cases as well]), but the People cite inapt precedent and relegate the applicable precedent to a "but see" cite.  This skirts dangerously close to the line of being a misrepresentation of the law.

13

influence"].) First (and chiefly), defendant argues that his statement was involuntary because he was subjected to "some subtle psychological coercion." This is the rationale *Miranda* cites for requiring its warnings and excluding un-warned statements in the prosecution's case-in-chief; if subtle psychological coercion were *also* enough to render a statement involuntary under the due process clause, then statements obtained in violation of *Miranda* would inevitably be subject to exclusion for all purposes, including impeachment. Yet, as noted above, that is not the law. Defendant cites *United States v. Eccles* (9th Cir. 1988) 850 F.2d 1357 in support of his argument, but the confession in that case was the product of police coercion and manipulation—factors not present here. (Accord, *United States v. Barnett* (D.Alaska 1992) 814 F.Supp. 1449, 1456 [distinguishing *Eccles* because police in *Eccles* "misled" the defendant].) Second, defendant argues that his statement was involuntary because he was "never told that he didn't have to answer questions" and was "never told that he was free to leave"; these factors relate to the test for whether a *Miranda* warning is necessary, not the test for whether a statement is involuntary. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 246-247; *Berkemer v. McCarty* (1984) 468 U.S. 420, 440.) Third, defendant argues that the potential for his statements to be used for impeachment had a "chilling effect" on his decision whether to testify. At most, defendant was dissuaded from testifying inconsistently with the statements he previously made to police. (See *Harris*, *supra*, 401 U.S. 222 at p. 226 ["The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances"].)

## III.  Evidentiary Issues

Defendant challenges two of the trial court's evidentiary rulings.  We review those rulings for an abuse of discretion.  (*People v. Pineda* (2022) 13 Cal.5th 186, 222.)

### A.  *Jennifer's post-battery sexual intercourse with her boyfriend*

Defendant argues that the trial court abused its discretion in not allowing him to elicit from Jennifer, on cross-examination, that she had sex with her boyfriend during the six or seven hours between the time defendant battered her on April 24, 2019 and the time she called the police.  Prior to trial, the trial court ruled that defendant could elicit from Jennifer that she did not report defendant's conduct for many hours, but could not elicit evidence of her sexual conduct with someone else unless Jennifer "state[d] something that opens the door" during her testimony.  At trial, defendant's lawyer told the court at a sidebar that he was "not going to argue that there was a delay in the reporting [by Jennifer] and therefore [jurors] shouldn't believe what Jennifer has to say."  Jennifer then testified, acknowledging that there were several hours between the incident with defendant "in the morning" and her reporting the incident to police in the late afternoon of that day.

The trial court did not abuse its discretion in excluding evidence of Jennifer's sexual conduct with another man in this sexual battery case.  A court has the discretion to exclude evidence if its "probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  Evidence that Jennifer had sex with her boyfriend during the hours between the time of the crime and

15

the time of reporting the crime is of minimal probative value because it does not tend to show, contrary to what defendant suggests, that Jennifer was *not* battered. This evidence might suggest to a jury that because Jennifer is sexually active, she might be more likely to have consented to defendant's sexual contact, but this evidence confuses the issues because the crime of sexual battery by fraud, by definition, reaches situations where the issue is not *consent* but rather the defendant's misrepresentations to obtain that consent. And this evidence is indisputably unduly prejudicial because the danger that a jury may infer that Jennifer consented to the touching by defendant because she is sexually active is the precise chain of reasoning—namely, that a person who has consensual sexual contact with one person is more likely to have consensual sexual contact with others—our Legislature sought to foreclose by enacting rape shield statutes. (Accord, Evid. Code, §§ 1103, subd. (c) & 782 [exclusion in criminal actions], 1106 & 783 [exclusion in civil actions].)

On appeal, defendant argues that Jennifer's sexual encounter with her boyfriend is relevant to show that Jennifer was not traumatized, and therefore was not a victim of sexual battery by defendant at all, because, according to defendant, a woman who has suffered a traumatizing event is thereafter incapable of having consensual sex. Apart from constituting a superlative example of offensive "mansplaining," this argument is also wrong: Whether or not *Jennifer* specifically identified any trauma she suffered is not an element of the crime of sexual battery by fraud (§ 243.4, subd. (c)). More to the point, this evidence might have been probative for purposes of undermining Jennifer's credibility if she had testified she was greatly

16

traumatized by defendant's battery, *but she did not*:  Instead, the officer who interviewed Jennifer when she reported the crime testified that, although "kind of shaken up a little bit," Jennifer was otherwise "calm but nervous."  Given the very minimal probative value of this evidence as compared with its high potential to confuse the jury and unfairly malign Jennifer, the trial court acted well within its discretion in excluding it.

### B.    *Liset's daughter's statement*

Defendant argues that the trial court erred in admitting the statement by Liset's daughter, "Ew, Mommy, why is he touching your chi-chis?  That's nasty."  Specifically, defendant urges that admission of this statement violates the hearsay rule.  He is wrong.

"Hearsay" is defined as "[(1)] a statement [(2)] made other than by a witness while testifying at the hearing and [(3)] that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).)  So-called "multiple hearsay"—that is, statements within statements—is admissible as long as each layer "meets the requirements of an exception to the hearsay rule." (*Id.*, § 1201.)

The trial court did not abuse its discretion in admitting Liset's testimony regarding her daughter's remark.  Her daughter's remark is admissible as an excited utterance because it was the product of "'the nervous excitement'" caused by witnessing defendant's sexual battery of her mother and made "'before there [was] time to contrive and misrepresent.'" (*People v. Poggi* (1988) 45 Cal.3d 306, 318; Evid. Code, § 1240.)  Indeed, defendant does not dispute that the daughter's statement is admissible under the excited utterance exception to the hearsay rule.  Thus, there was no violation of the hearsay rule.  On appeal

17

(as he did before the trial court), defendant urges that this is a situation of "double hearsay" because Liset was relaying what her daughter said in the examination room.  But Liset was a "witness . . . testifying at the [trial]" when she relayed her daughter's statement (cf. Evid. Code, § 1200, subd. (a)); accordingly, *Liset's statements while testifying* are not themselves hearsay and thus not a "second layer" of hearsay.  Indeed, if defendant were correct, then no witness could *ever* relay an excited utterance (or, frankly, any other statements they witnessed out of court); this is most certainly not the law.  (E.g., *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 415-416 [upholding admission of witness testimony of another person's out-of-court excited utterance].)

## IV.  Prosecutorial Misconduct

Defendant next argues that he is entitled to reversal of his convictions due to prosecutorial misconduct.  Conduct by a prosecutor may violate a defendant's right to due process under either the federal or state Constitutions.  Conduct violates *federal* due process if it """"infects the trial with such unfairness as to make the conviction a denial of due process."""" (*People v. Adams* (2014) 60 Cal.4th 541, 568.)  Conduct violates *state* due process """"only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury."""" (*Ibid.*)  Prosecutorial misconduct violating these standards in way that "irreparably damage[s]" a defendant's right to a fair trial warrants the grant of a mistrial, at least if a mistrial is requested.  (*People v. Ayala* (2000) 23 Cal.4th 225, 283-284 (*Ayala*); *People v. Penunuri* (2018) 5 Cal.5th 126, 149.)  We independently review whether a prosecutor's conduct constitutes misconduct (*People v. Uribe* (2011) 199 Cal.App.4th

18

836, 860), but review a trial court's decision whether to declare a mistrial for an abuse of discretion (*Ayala*, at p. 283).

### A.    *Questioning of Liset R.*

Defendant effectively argues that the prosecutor committed misconduct by asking questions of Liset that improperly suggested defendant had sexually battered other patients.[4]  In an attempt to show that Liset was not colluding with Jennifer in falsely reporting sexual battery by defendant, the prosecutor asked Liset the following question:  "At the time that you were telling [the clinic's managing physician] what had just happened to you, were you aware of a prior incident involving the defendant?"  At a sidebar, the prosecutor clarified that her question was meant to elicit whether Liset knew of "the April incident" with Jennifer, and the trial court told the prosecutor to "clarify" her question.  The prosecutor then asked Liset if she "kn[e]w of" Jennifer on June 13, 2019 (the date Liset was sexually battered), and she replied that she had found out about Jennifer that day.  At a second sidebar, defense counsel remarked that he was "not claiming misconduct," and the trial court urged the prosecutor to rephrase the question again.  The prosecutor then asked, "[W]hen you were in the exam room," "[d]id you know of an incident [with] Jennifer M?" and Liset responded that she did not.

---

4    Defendant seems to treat this as an evidentiary issue in his brief.  However, because he is attacking the prosecutor's questions (rather than the witness's answers), and because questions are not evidence, this is more properly examined as a species of prosecutorial misconduct directed to the prosecutor's questioning.

19

This was not prosecutorial misconduct. Although a prosecutor can commit misconduct by "ask[ing] questions she knew called for inadmissible evidence" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1348), the prosecutor in this case did not do so. The first question in this line of questioning sought to elicit "a prior incident" (singular, not plural), and the prosecutor explained she was trying to elicit whether Liset knew of the prior incident involving Jennifer. To be sure, there was a *second* prior incident—a sexual battery defendant committed in 1997 on a patient—that the trial court had ruled was admissible only if proven by the victim's testimony and not through the resulting misdemeanor conviction. But at the time the jury heard the prosecutor's question, the jury only knew about the April 2019 incident involving Jennifer—which is precisely what the prosecutor rephrased her question to reference. Despite defendant's argument on appeal that the jury "clearly [was] left to speculate as to what other incidents" involving defendant were "floating out there," there was no danger that the jury could have thought there was some other incident, particularly in light of the prosecutor's subsequent, clarifying questions. Thus, there was no misconduct. In his opening brief, defendant argues that the trial court "should have declared a mistrial" following the prosecutor's question, but defendant forfeited this claim because he did not move for a mistrial on these grounds. (*People v. Carrasco* (2014) 59 Cal.4th 924, 965; *People v. Chatman* (2006) 38 Cal.4th 344, 368 ["Defendant may not argue that the court should have granted a mistrial he did not request"].) In his reply, defendant counters that the trial court was required to sua sponte grant a mistrial once the prosecutor made the argument; even if we assume a trial court may in some circumstances have a sua

20

sponte duty to declare a mistrial, it need not do so where an admonition or instruction can cure any prejudice (*People v. Harris* (2013) 57 Cal.4th 804, 848), and that was most certainly the case here.

### B.     *The prosecutor's opening statement*

Defendant also argues that the prosecutor committed misconduct during her opening statement. Specifically, defendant cites the prosecutor's statement describing that Liset "talks to [the clinic's supervising physician], explains what happened. He asks her to fill out a patient complaint form, . . . [s]he does, and *the defendant is fired that day*." (Italics added.) Defendant did not contemporaneously object. Instead, defendant objected to the italicized portion only after the prosecutor finished her opening statement and defendant delivered his. However, the trial court agreed that the supervising physician's act of firing defendant was "irrelevant" to the pending charges and also, "under [Evidence Code section] 352[,] its probative value is outweighed by the prejudicial impact" because "it appears that [the supervising physician] is making a determination that [the battery] did, in fact, happen." So the court immediately gave the jury the following admonition: "If you recall at the beginning before counsel made their opening statement, I advised you that [those statements are] not evidence. The comment by [the prosecutor] about the defendant being fired is irrelevant. You're to disregard it and not consider it for any purpose."

There was no prosecutorial misconduct warranting relief on appeal. A prosecutor's remarks to the jury can constitute prosecutorial misconduct if they create a "'reasonable likelihood [that] the jury understood or applied the complained-of comments in an improper or erroneous manner.'" (*People v. Brown* (2003)

21

31 Cal.4th 518, 553.) That did not happen here. There had been no pretrial ruling prohibiting mentioning of defendant's termination, so the prosecutor did not transgress a prior ruling of the court. More to the point, once the trial court *subsequently* determined that defendant's firing was inadmissible, the court told the jury the firing was "irrelevant," and thus to be "disregard[ed]" "and not consider[ed] . . . for any purpose." When a trial court gives such an admonition, our Supreme Court ruled in *People v. Bennett* (2009) 45 Cal.4th 577, 595, "we assume the jury followed the admonition and that prejudice was therefore avoided." Defendant urges that this assumption was rebutted, but points to nothing in the record to support his position. Defendant also urges that *Bennett* is no longer good law because one of the cases *Bennett* cited was later overruled; however, the proposition for which *we* cite *Bennett* remains good law. (Accord, *People v. Ramirez* (2022) 13 Cal.5th 997, 1125 [applying this principle].)

## V.    Ineffective Assistance of Counsel

Defendant lastly argues that his trial counsel was constitutionally ineffective for three reasons. An attorney provides constitutionally ineffective assistance if (1) his representation was deficient, and (2) prejudice flows from that deficient representation (because there is a reasonable possibility that, absent the deficient performance, the outcome of the trial would have been different). (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Mickel* (2016) 2 Cal.5th 181, 198.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide

22

one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) We independently examine whether counsel was constitutionally ineffective. (*People v. Mayfield* (1993) 5 Cal.4th 142, 199.)

### A. *Cross-examination of Jennifer*

Defendant argues that his trial counsel was constitutionally ineffective because counsel's cross-examination of Jennifer was deficient in three respects. During her direct and cross-examinations, Jennifer testified that (1) defendant did not make any sounds while he groped her breasts, (2) her legs were spread apart "a little bit" when they hung over the edge of the examination table immediately before he penetrated her vagina with his fingers, and (3) she did not discuss with defendant her immunity to chicken pox or obtain paperwork for "blood work." In a recorded interview immediately after the incident, Jennifer stated that (1) defendant told her, "Oh, you have to find bumps on the sides," while he was groping her breasts, (2) her legs were "kind of spread apart" when they hung over the edge of the examination table, and (3) she and defendant discussed her immunity to chicken pox and blood work during the examination. Defendant asserts that counsel's failure to elicit these three inconsistencies in Jennifer's testimony constituted ineffective assistance of counsel.

We independently conclude that defense counsel was not constitutionally ineffective for not cross-examining Jennifer on these three points because we can conceive of sound tactical reasons for not doing so. As a threshold matter, "the manner of cross-examination [is] within counsel's discretion and rarely

23

implicate[s] ineffective assistance of counsel." (*People v. McDermott* (2002) 28 Cal.4th 946, 993.) Further, none of these three points—individually or collectively—deals with the specific sequence or type of touching defendant inflicted upon Jennifer; on the issues of what defendant did to sexually batter her, Jennifer's testimony was internally consistent and showed remarkable similarities to the sequence and type of touching by which defendant sexually battered Liset. Counsel may have also had tactical reasons not to raise each of these individual points. Having Jennifer focus on what defendant was saying (or not saying) while he was groping her would necessarily focus the jury—and thereby take as a given—that defendant was, in fact, groping her breasts, which was inconsistent with his "it never happened" defense at trial. Indeed, eliciting that defendant told Jennifer to "look for bumps on the sides" runs the danger of reinforcing that defendant was trying to make it *seem* like this was a medical examination when, in fact, it was not. The "discrepancy" regarding how far apart Jennifer's legs were does not appear to be much of an inconsistency at all. And declining to examine Jennifer regarding the discussion about chicken pox and blood work makes sense because Jennifer's medical report memorializing that those topics were discussed was admitted into evidence—and argued by defense counsel in closing argument; counsel's decision to focus on the report rather than have Jennifer recount the details of the encounter one more time in front of the jury was a reasonable tactical maneuver. Contrary to what defendant asserts, these three points were neither "major discrepancies" nor "material" "lie[s]" in Jennifer's testimony.

24

**B.** *Stipulation*

Defendant next argues that defense counsel was constitutionally ineffective for stipulating that "defendant's alleged conduct toward both Jennifer M. and Liset R. are represented departures from the medical practice standards, medical conduct, and medical ethics." Defendant is wrong. Defense counsel made clear during trial that the theory of defense was either that defendant did not touch the victims as they testified or that defendant had a valid medical purpose for doing so. Given this theory, the stipulation was a reasonable tactical decision because it eliminated an issue that was irrelevant to the defense theory and thus encouraged the jury to focus on the issues that *were* critical to that theory. (*People v. Farwell* (2018) 5 Cal.5th 295, 308 [the decision to stipulate is a tactical one which "can serve the salutary goals of expediting and simplifying proceedings, thus reducing the chance for confusion"].) Defendant's argument on appeal that defense counsel should have pursued a wholly different defense theory impermissibly second guesses trial counsel's tactical decision and is not a basis upon which to attack the convictions. (*People v. Scott* (1997) 15 Cal.4th 1188, 1212 [hindsight may not be used to second guess tactical decisions].) What is more, to the extent defendant argues that counsel may never stipulate to the existence of the facts underlying an element of an offense as a tactical matter, he is simply wrong. (See *People v. Freeman* (1994) 8 Cal.4th 450, 498.)

**C.** ***Recalling Veronica Romero as a defense witness***

Defendant contends that defense counsel was constitutionally ineffective for not recalling Veronica Romero (Romero), one of the clinic's medical assistants, as a defense

25

witness. (The prosecution had already called Romero as a witness to testify on a different point.) In an earlier interview, Romero indicated that she had "quickly" gone into the "patient exam room" to hand defendant Jennifer's "patient file"; that she "did not notice or observe anything unusual" while in the room; and that she overheard defendant asking Jennifer about whether she had been vaccinated for chicken pox. Defendant argues that calling Romero to testify to these facts would have shown Jennifer's testimony about the sexual battery to be false, such that failing to call Romero as a witness constituted ineffective assistance.

Defense counsel was not ineffective for not calling Romero as a defense witness to impeach Jennifer's testimony. In the interview, Romero acknowledged that she was in the exam room for "less than 1 minute," and had no idea how long Jennifer had been in the room before or after that "1 minute." Based on what Romero observed, the entire battery occurred *after* Romero left (because finding defendant with his hands on Jennifer's breasts or his fingers inside her vagina would have qualified as "unusual"), so defense counsel could have reasonably determined that Romero's testimony would have little, if any, impeachment value. And although Romero heard defendant and Jennifer discuss Jennifer's chicken pox immunizations, defense counsel introduced Jennifer's medical records and, on the basis of those records, argued to the jury in closing argument that Jennifer was not being truthful because she could not recall discussing immunizations when she testified; electing not to call Romero just so she could repeat a fact that was elsewhere in evidence was a reasonable tactical decision, particularly because the defense

26

strategy at trial was not to call *any* witnesses and instead to point to deficiencies in the People's case.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
CHAVEZ